837 So.2d 11 (2002)
MOBIL EXPLORATION & PRODUCING U.S. INC., Mobil Producing Texas & New Mexico Inc., Mobil Oil Exploration & Producing Southeast Inc., Mobil Exploration and Producing North America Inc., St. Mary Land & Exploration Company, St. Mary Operating Company and Samuel Gary Jr. & Associates, Inc.
v.
CERTAIN UNDERWRITERS SUBSCRIBING TO COVER NOTE 95-3317(A), Certain Underwriters Subscribing to Policy of Insurance 95-3317(B), Certain Underwriters Subscribing to Cover Note 96-3393(A), and Certain Underwriters Subscribing to Policy of Insurance 96-3393(B), Cliffs Drilling Company, Soriero & Company, Inc., and Aon Texas Acquisitions Corporation.
No. 2001 CA 2219.
Court of Appeal of Louisiana, First Circuit.
November 20, 2002.
Rehearing Denied January 10, 2003.
Writ Denied April 21, 2003.
*15 George H. Robinson, Jr., George Arceneaux III, P. Matthew Jones, Lafayette, Counsel for Plaintiffs/Third Appellants Mobil Exploration & Producing U.S. Inc., et al.
Newman Trowbridge, Jr., Lafayette, Marc R. Brosseau, Denver, CO, Counsel for Plaintiffs/Appellees St. Mary Land & Exploration Co., et al.
Winston Edw. Rice, Covington, Dr. Sal Litvinoff, Baton Rouge, Counsel for Defendant/First Appellant Cliffs Drilling Company.
James L. Cornell, Houston, TX, Counsel for Defendant/Appellee Cliffs Drilling Company.
Kent E. Westmoreland, J. Clifton Hall III, Wendy T. Blanchard, Karen K. Milhollin, Houston, TX, Counsel for Defendants/Second Appellants Certain Underwriters.
Richard P. Ieyoub, Attorney General, Isaac Jackson, Jr., Assistant Attorney General, Baton Rouge, Patrick H. Martin, Clinton, Counsel for Intervenor State of Louisiana Through State Mineral Board and the Office of Mineral Resources of the Department of Natural Resources.
Before: WHIPPLE, LANIER,[1] and KLINE,[2] JJ.
KLINE, J.
This is an appeal from a judgment in favor of an oil company and its co-owners *16 of various rights and interests, against a drilling company and its insurers for contractual and tort damages associated with the "blowout" of a well. For the reasons that follow, we affirm in part and reverse in part.

FACTS AND PROCEDURAL HISTORY
On February 14, 1995, Mobil Exploration & Producing U.S. Inc. ("MEPUS") issued an invitation for bids on the "turnkey" drilling of a well, denominated "St. Mary's Well No. 1," located in St. Mary Parish, Louisiana. On March 3, 1995, Cliffs Drilling Company ("Cliffs") forwarded a proposed contract to MEPUS with a letter indicating changes made from the original proposal. No other action was taken on the matter until MEPUS notified Cliffs in September of 1995 of its intent to go forward with the project. Cliffs responded with a letter dated October 3, 1995, which included a request to change pricing on three items. On October 20, 1995, MEPUS forwarded a revised contract to Cliffs for acceptance, stating, "This agreement is similar to the one submitted by you in March. However, it has been revised to reflect some of the changes you proposed to the wording and to update the pricing based on your October 3, 1995 letter...."
The contract was signed by representatives of both Cliffs and MEPUS. Cliffs began drilling operations in November of 1995. Thereafter, difficulties were encountered during the drilling operation that resulted in a well "blowout" on or about January 13, 1996.[3] Cliffs abandoned the drilling operation on or about August 1, 1996.
On January 13, 1997, a petition for damages was filed by MEPUS, Mobil Producing Texas & New Mexico Inc. ("MPTNM"), Mobil Oil Exploration & Producing Southeast Inc. ("MOEPSI"), Mobil Exploration and Producing North America Inc. ("MEPNA"), St. Mary Land & Exploration Company ("St. Mary Land"), St. Mary Operating Company ("St. Mary Operating"),[4] and Samuel Gary Jr. & Associates, Inc. "and its co-interest owners"[5] (hereinafter referred to collectively as "Mobil," excepting the St. Mary plaintiffs) against Cliffs, "Certain Underwriters Subscribing to Cover Note 95-3317(A),"[6] *17 "Certain Underwriters Subscribing To Policy of Insurance 95-3317(B),"[7] "Certain Underwriters Subscribing To Cover Note 96-3393(A),"[8] "Certain Underwriters Subscribing To Policy of Insurance 96-3393(B)"[9] (insurers referred to hereinafter collectively as "Underwriters"), Soriero & Company, Inc. ("Soriero") and Aon Texas Acquisions Corporation ("Aon").
Plaintiffs' petition alleged that St. Mary was the "fee owner" of the land situated in Section 25, Township 17 South, Range 9 East of St. Mary Parish, and that St. Mary and the remaining plaintiffs owned interests in mineral leases, mineral servitudes, or other rights to explore for and produce minerals on or beneath the property. Plaintiffs also alleged that in conjunction with their exploration program to identify and produce oil and gas reserves on the property, it received bids from Cliffs and other drilling contractors to drill exploratory oil and gas wells on the property. It was alleged that one or more of the plaintiffs entered into a "Turnkey Drilling Contract" with Cliffs, which required, among other things, that Cliffs drill the St. Mary Land Company No. 1 well on the property.
It was also alleged that Cliffs failed to provide adequate personnel, equipment, materials, services, and efforts to maintain control of the well, resulting in Cliffs' repeatedly losing control of the well and culminating in a failure to take adequate measures to regain control in order to complete the drilling or to fulfill its obligations under the contract. Plaintiffs claimed that Cliffs abandoned the project and failed to fulfill its contractual obligations. Plaintiffs asserted that they suffered serious and extensive property and other damage as a result of Cliffs' failure to fulfill its obligations under the drilling contract.
Additionally, plaintiffs charged that Cliffs settled with its insurers, while one or more of plaintiffs' claims pending against these insurers were denied, and that insurance coverage had been previously misstated or misrepresented. Plaintiffs claimed that one or more of the named defendants/insurers had "issued, delivered, subscribed to, or underwritten certain contracts of insurance and/or indemnity ..., which were issued, delivered, or assembled by or through Soriero" and which provided direct coverage to plaintiffs for all costs incurred in connection with the control of *18 the well and for all costs and expenses incurred in restoring, redrilling or replacing the well, in addition to coverage for Cliffs' liability for damages. Nevertheless, plaintiffs contended that the insurers colluded with Cliffs to deny coverage to plaintiffs and that such denial was arbitrary and capricious.
Furthermore, plaintiffs alleged privity of contract with Cliffs' insurance brokers[10] in the procurement of the insurance coverage at issue and claimed the brokers negligently, unreasonably, and without due care misled the plaintiffs concerning the insurance coverage and violated the brokerage contract, of which plaintiffs were the third party beneficiaries, by failing to procure the promised coverages.
Subsequently, amendments were made alleging additional causes of action for: failure to perform in a workmanlike manner; fraud; misrepresentation and other unethical conduct; damages under the Louisiana Unfair Trade Practices Law, La. R.S. 51:1401 et seq.; negligent damage to oil and gas reserves; and a violation of Cliffs' contractual obligation to disclose insurance claims. In additional amendments, a cause of action was also asserted against Cliffs' insurers for their arbitrary and capricious denial of the plaintiffs' claims and for a violation of their duty of fair dealing with an insured under La. R.S. 22:658 and 22:1220. Finally, recovery was sought from Cliffs' insurance brokers for misrepresentation of coverage and failure to procure the requisite coverage.[11]
An intervention was filed by the State of Louisiana ("State") seeking to join in the demands of the plaintiffs against the defendants, alleging that the State was the owner of certain lands and waterbottoms that were affected by the operations and drilling at issue in the suit. Various other third party and reconventional demands were asserted between the parties to the suit, which are not subject to this appeal.
Among numerous other pre-trial rulings not relevant to the instant appeal, the trial court rendered summary judgment in favor of plaintiffs, holding that the contract signed on October 22, 1995 was the law between the parties, and that Cliffs breached the contract "by walking off the well."
The remainder of the factual issues before the court were submitted to a jury for determination, with the exception of issues relating to the insurers, costs, penalties, and attorney fees, which were ruled on by the trial judge. The jury returned the following responses to the jury interrogatories:
*19
 PART I  Contract Claims
* * * The Court has previously ruled that Cliffs Drilling breached the October 22, 1995
Turnkey Contract by walking off the well.
1. Do you find that the breach of contract by Cliffs Drilling was a legal cause of
damage to Mobil?
 YES &check; NO ____
 * * *
2. What is the amount of damage to Mobil, expressed in dollars, caused by the breach of
contract by Cliffs Drilling?
 Excess cost to drill the St. Mary No. 2 well $ 4,756,598
3. Do you find that Mobil failed to mitigate the damages, if any, and the failure to
mitigate was a legal cause of any portion of the damages?
 YES ____ NO &check; 
4. If you answered YES to Question No. 3 in what amount?
 _____________________
 PART II  Statutory Claims
1. Do you find that Cliffs Drilling engaged in unfair trade practices which was the legal
cause of damage to Mobil?
 YES &check; NO ____
 * * *
2. Do you find that Cliffs Drilling engaged in unfair trade practices with the intent to
injure Mobil's business?
 YES ____ NO &check; 
 * * *
3. What is the amount of damage to Mobil, expressed in dollars, legally caused by
unfair trade practices by Cliffs Drilling?
 Excess cost to drill the St. Mary No. 2 well $4,756,598
 Loss of insurance proceeds $1,050,000
4. Do You Find That Underwriters Breached The Duty Of Good Faith And Fair
Dealing By Failing To Promptly Settle The Mobil Claim?
 YES ____ NO &check; 
5. If you have answered No. 4 YES, what amount of damages do you find in dollars
Mobil sustained?
*20
 $ N/A 
6. If you have answered YES to Question No. 4, do you award a penalty?
 YES N/A NO N/A 
7. If you answered YES to Question No. 6, what penalty expressed in dollars do you
award?
 $ N/A 
 PART III  Negligence Claims
1. Do you find that Cliffs Drilling was negligent in the drilling and/or well control of the
St. Mary No. 1 well?
 YES &check; NO ____
 * * *
2. Do you find that the negligence of Cliffs Drilling was a legal cause of damage to the
plaintiffs and the State of Louisiana?
 YES &check; NO ____
 * * *
3. What is the amount of damage to the plaintiffs and the State of Louisiana, expressed
in dollars, legally caused by the negligence of Cliffs Drilling?
 Loss of Hydrocarbons $ 17,000,000
4. What is the amount of damage to Mobil, expressed in dollars, legally caused by the
negligence of Cliffs Drilling?
 Excess cost to drill the St. Mary No. 2 well $4,756,598
 Excess cost to complete the St. Mary No. 2 well $ Ø 
 Excess cost to drill the St. Mary No. 3 well $ Ø 
5. Do you find that Mobil failed to mitigate the damages, if any, and the failure to
mitigate was a legal cause of any portion of the damages?
 YES ____ NO &check; 
6. If you answered YES to Question No. 5, in what amount?
 N/A 
February 8, 2000
 s/ James P. Bridges 
 FOREPERSON
*21 A judgment was signed in accordance with the jury verdict on July 7, 2000 and was later amended on April 17, 2001. That judgment also allocated the percentage of interest of each plaintiff and ruled on the issues with respect to the insurers, costs, penalties, and attorney fees. In the amended and last judgment, the trial court first reiterated its earlier ruling that Cliffs had breached its contract with Mobil, and rendered judgment in favor of plaintiffs against Cliffs for breach of contract in the amount of $4,756,598, "representing the excess cost to drill the St. Mary No. 2 Well." On the insurance coverage issue, the court ruled that Underwriters provided coverage to plaintiffs and rendered judgment thereunder in favor of plaintiffs in the amount of $3,537,322, "representing the excess cost of drilling the St. Mary No. 2 well to 17,200 feet and against Cliffs Drilling Company individually for $1,219,276, the additional excess cost of drilling the St. Mary No. 2 well to turnkey depth of 19,000 feet." Under the Louisiana Unfair Trade Practices Law, judgment was rendered in favor of plaintiffs and against Cliffs for $4,756,598, "the excess cost of drilling the St. Mary No. 2 Well," and in the amount of $1,050,000 for loss of insurance proceeds. On the negligence claim, the trial court rendered judgment in favor of plaintiffs in the amount of $4,756,598 against Cliffs and its insurers.[12] Judgment was further rendered in favor of plaintiffs and the State of Louisiana in the amount of $17,000,000 against Cliffs and its insurers for the loss of hydrocarbons. Some $129,511 in expert witness fees and other costs were taxed to the defendants, in solido. Attorneys' fees in the amount of $380,000 were awarded under the Unfair Trade Practices Law.[13]
Cliffs has appealed from the judgment of the trial court,[14] urging the following assignments of error:
1. The district court erred in granting summary judgment that the contract dated October 22, 1995, was that agreed to by the parties;
2. The district court erred in granting summary judgment holding Cliffs in breach of contract;
3. The district court erred in granting summary judgment denying Cliffs any benefit of its contract with Mobil for the drilling of the St. Mary's No. 1 well;
4. The district court erred in allowing recovery to plaintiffs and intervenors of damages for alleged loss of hydrocarbons;
5. The district court erred in allowing Mobil recovery from Cliffs under the Louisiana Unfair Trade Practices [Law]; and
6. The district court erred in refusing to submit for decision by the jury Cliffs' affirmative defense of comparative negligence.
Cliffs' insurers have also appealed and urge the following assignments of error:

*22 I. The trial court was legally incorrect when it ruled before trial that breach of contract had occurred, in failing to recognize and enforce the contracted-for remedies and limitations, and in holding that the contract was dissolved entirely and not just from the date of breach. It further erred when it removed all contract issues of fact from the jury, allowing it to decide only the issue of damages, and fatally flawing the ultimate jury verdict.
II. The trial court erred by failing to exercise its gatekeeping function and exclude expert testimony of lost hydrocarbons that was speculative, based upon unproven facts, inherently unreliable, and inadmissible under Daubert and LSA-C.C. art. 702. The trial court further erred when it failed to overturn the jury award of $17 million for lost hydrocarbons as speculative based upon the improper expert testimony and the lack of any evidence that the hydrocarbons were lost at all.
III. The trial court was legally incorrect when it held that the loss of hydrocarbon award was covered property damage under Cliffs' insurance, and that the excess costs of drilling a second well under different contract parameters were equivalent covered redrill costs for the first well that was lost. It further erred by failing to enforce the plain terms and exclusions of the policies.
Mobil also appealed the trial court judgment, claiming the trial court erred in not permitting plaintiffs to present their claims based on fraudulent conduct under Texas law, and in failing to award plaintiffs statutory damages under the insurance law of Texas.

SUMMARY JUDGMENT FINDING VALID CONTRACT AND BREACH OF CONTRACT
On appeal, summary judgments are reviewed de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Simmons v. Berry, 98-0660, p. 4 (La.App. 1 Cir. 12/22/00), 779 So.2d 910, 913-14; J. Ray McDermott, Inc. v. Morrison, 96-2337, p. 9 (La.App. 1 Cir. 11/7/97), 705 So.2d 195, 202, writs denied, 97-3055, 97-3062 (La.2/13/98), 709 So.2d 753, 754. A summary judgment may be rendered dispositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of summary judgment does not dispose of the entire case. La. C.C.P. art. 966(E).
The motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Bergeron v. Williams, 99-0886, p. 4 (La.App. 1 Cir. 5/12/00), 764 So.2d 1084, 1087, writ denied, XXXX-XXXX (La.9/15/00), 768 So.2d 1281; Sanders v. Ashland Oil, Inc., 96-1751, p. 5 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1034, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. The motion should be granted only if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action, and is now favored. La. C.C.P. art. 966(A)(2). The initial burden continues to remain with the mover to show that no genuine issue of material fact exists. Bergeron v. Williams, 99-0886 at pp. 4-5, 764 So.2d at 1087. If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse *23 party's claim, action or defense, then the nonmoving party must produce factual support sufficient to satisfy his evidentiary burden at trial. La. C.C.P. art. 966(C)(2). If the nonmoving party fails to do so, there is no genuine issue of material fact and summary judgment should be granted. La. C.C.P. arts. 966 and 967; Bergeron v. Williams, 99-0886 at p. 5, 764 So.2d at 1087; LeJeune v. Brewster, 97-2342, pp. 3-4 (La.App. 1 Cir. 11/6/98), 722 So.2d 74, 76. In determining whether an issue is "genuine," courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751.
A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. Hardy v. Bowie, 98-2821, p. 6 (La.9/8/99), 744 So.2d 606, 610, Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 at p. 27, 639 So.2d at 751. Facts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute. South Louisiana Bank v. Williams, 591 So.2d 375, 377 (La.App. 3 Cir.1991), writ denied, 596 So.2d 211 (La.1992). Simply put, a "material" fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 at p. 27, 639 So.2d at 751.
Because the applicable substantive law determines the materiality of facts in a summary judgment setting, we now turn to a discussion of the applicable law. See J. Ray McDermott, Inc. v. Morrison, 96-2337 at p. 11, 705 So.2d at 203.

Validity of October 22, 1995 Contract
Contracts have the effect of law for the parties. La. C.C. art.1983. The interpretation of a contract is the determination of the common intent of the parties. La. C.C. art.2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art.2046. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art.2050.
In such cases, the meaning and intent of the parties to the written contract must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. La. C.C. art. 1848; Allain v. Shell Western E & P, Inc., 99-0403, p. 8 (La.App. 1 Cir. 5/12/00), 762 So.2d 709, 714; Hampton v. Hampton, Inc., 97-1779, p. 6 (La.App. 1 Cir. 6/29/98), 713 So.2d 1185, 1189. Contracts subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law. The use of extrinsic evidence is proper only where a contract is found to be ambiguous after an examination of the four corners of the agreement. Id.[15]
Further, courts should not strain to find an ambiguity where none exists. Watts v. Aetna Casualty and Surety Company, 574 So.2d 364, 369 (La.App. 1 Cir.), writ denied, 568 So.2d 1089 (La.1990); Cell-O-Mar, Inc. v. Gros, 479 So.2d 386, 396 (La.App. 1 Cir.1985), writs denied, 481 So.2d 1332, 1333 (La.1986). Whether a contract is ambiguous or not is a question of law. Gaylord Container Corporation v. CNA Insurance Companies, 99-1795, p. 9 (La.App. 1 Cir. 4/3/01), 807 So.2d 864, 870, writ denied, 2001-2368 (La.12/07/01), *24 803 So.2d 31; Billiot v. Terrebonne Parish Sheriff's Office, 98-0246, pp. 9-10 (La.App. 1 Cir. 2/19/99), 735 So.2d 17, 24, writ denied, 99-1376 (La.7/2/99), 747 So.2d 22; Watts v. Aetna Casualty and Surety Company, 574 So.2d at 369; Borden, Inc. v. Gulf States Utilities Company, 543 So.2d 924, 928 (La.App. 1 Cir.), writ denied, 545 So.2d 1041 (La.1989); Aycock v. Allied Enterprises, Inc., 517 So.2d 303, 309 (La. App. 1 Cir.1987), writs denied, 518 So.2d 512, 513 (La.1988). When addressing legal issues, a reviewing court gives no special weight to the findings of the trial court. It conducts a de novo review of questions of law and renders a judgment on the record. Campbell v. Markel American Insurance Company, XXXX-XXXX, p. 5 (La.App. 1 Cir. 9/21/01), 822 So.2d 617, 620, writ denied, 2001-2813 (La.1/4/02), 805 So.2d 204; Gaylord Container Corporation v. CNA Insurance Companies, 99-1795 at p. 9, 807 So.2d at 870. However, factual findings pertinent to the interpretation of a contract are not to be disturbed on appeal absent manifest error. Martin Exploration Company v. Amoco Production Company, 93-0349, p. 6 (La.App. 1 Cir. 5/20/94), 637 So.2d 1202, 1206, writ denied, 94-2003 (La.11/4/94), 644 So.2d 1048. See also Amoco Production Company v. Fina Oil & Chemical Company, 95-1185, p. 13 (La.App. 1 Cir. 2/23/96), 670 So.2d 502, 511-512, writ denied, 96-1024 (La.5/31/96), 673 So.2d 1037.
When a contract can be interpreted from the four corners of the instrument, the question of contractual interpretation is answered as a matter of law, and summary judgment is appropriate. Brown v. Drillers, Inc., 93-1019, p. 9 (La.1/14/94), 630 So.2d 741, 749-750.
When the parties sign a document, they are presumed to have consented to its contents. Griffin v. Lago Espanol, L.L.C., 2000-2544, p. 10 (La.App. 1 Cir. 2/15/02), 808 So.2d 833, 840; Sonnier v. Boudreaux, 95-2127, p. 7 (La.App. 1 Cir. 5/10/96), 673 So.2d 713, 717. Signatures to obligations are not mere ornaments. Tweedel v. Brasseaux, 433 So.2d 133, 137 (La. 1983). A party to a contract cannot avoid its obligations by contending that he did not read it or he did not fully understand it. Bogalusa Community Medical Center v. Batiste, 603 So.2d 183, 186 (La.App. 1 Cir.1992). Even a misrepresentation does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skills. Sonnier v. Boudreaux, 95-2127 at p. 7, 673 So.2d at 718.
The alleged contract between Mobil and Cliffs was dated October 22, 1995 and consisted of some twenty-five typed pages with twenty-three pages of attachments and/or exhibits containing additional contractual terms. The twenty-fifth page of the contract contained the handwritten signatures of Nelson W. Burton, the Drilling Superintendent of MEPUS, and Gary W. Owen, Vice President of Engineering Services of Cliffs. These individuals also affixed their handwritten initials, "NWB" and "GWO," respectively, to: the fifth page of Exhibit "A," the fourth page of Exhibit "B," the first page of Exhibit "D" (at paragraph "3.1"), the second page of Exhibit "D" (at paragraph "4.1"), the sixth page of Exhibit "D" (twice at paragraph "6.1"), and, on the last page of Exhibit "D" (along with the typewritten full names and addresses of Mr. Burton and Mr. Owen).
Cliffs argues that it did not consent to certain provisions of the signed contract that were changed from an earlier proposal and that Mobil misled it by indicating there were only minor changes made to the final version of the contract. On this point, in its reasons for granting partial *25 summary judgment in favor of Mobil, the trial court stated:
Defendant Cliffs asserts that factual dispute concerning the validity of the contract precludes summary judgment. It is Cliffs' contention that there is evidence in the pleadings, depositions, answers to interrogatories, and admissions on file that the changes which they had proposed to Mobil's initial request for bids had been accepted by Mobil, that this acceptance had been conveyed to Cliffs, and that their (Cliffs"[sic]) agreement to the contract of October 22, 1995 was a result of unilateral error. An issue of intent precludes summary judgment.
It is the opinion of the court that doctrine of unilateral error cannot save a party from the consequences of an otherwise valid contract when that error is the result of simple negligence. Neither the deposition testimony of Lee Riley, making oblique reference to granting the contract to Cliffs, nor the reference to "cleaning up the contract" in the deposition of Charles Peck, raise a genuine issue that there was any other contract between the parties, nor that the October contract was the result of any misrepresentation on the part of Mobil. All of the circumstances, and the ongoing correspondence between the parties, make clear that a written contract was required. There was only one completed contract between Mobil and Cliffs. There [is] no evidence in the pleadings, depositions, answers to interrogatories, or admissions on file raising any genuine issues about the consent of the parties thereto.
The two parties find one case for guidance to the Louisiana law on this issue, Scott v. Bank of Coushatta, 512 So.2d 356 (La.1987). In that case a novation induced by fraud was not allowed to negate the obligations of a prior contract. It is interesting to note that the majority and the dissent agree on legal principles. They disagree on the impact of the particular factsthe relative sophistication of the parties and the degree of fault by the "negligent" party. This court is of the opinion that the circumstances in the case at bar, with less relative difference in sophistication between the parties, less indicia that there ever was a meeting of the minds creating a first agreement, and clear negligence on the part of Cliffs rather than fraud by Mobil, the case is better support for the position of the latter.
This court denies relief to a party whose error was caused by inexcusable want of care. With this position, it is not necessary for the court to address the issue of judicial and evidentiary admission.
The Turnkey Drilling Contract of October 22, 1995 is the contract at issue in this litigation. Mobil's motion for partial summary judgment is GRANTED.
A mistake regarding provisions of the contract would surely have been avoided by a simple reading of the contract. Cliffs' oversight in this respect, on a contract of this magnitude, cannot be used to later suggest the contract was vitiated by Cliffs' earlier neglect. We reject defendants' argument that factual issues remained that would have precluded summary judgment on the issue of the terms of the contract, necessitating presentation to the jury. We find that all of the facts upon which the trial court based its summary judgment were not subject to a genuine dispute, and that the written contract governed the relationship of the parties. Thus, we find that the trial court reasonably rejected the defendants' position, and we conclude that the summary judgment rendered in favor of Mobil, decreeing the signed contract to *26 be the agreement between the parties, was not in error.

Breach of Contract
The trial court's reasons for judgment indicate the court based its findings of breach on three conclusions, as follows:
1) Although turnkey contracts are common in the industry, the provisions of the Turnkey Contract of October 22, 1995 did not afford the driller an unrestricted option to walk off the well. There was no "Gulf Coast clause." Paragraph 16.5 obligated Cliffs to redrill if requested by Mobil.
2) The depositions introduced into evidence clearly demonstrate that during the period from July 11 through July 30, 1996, Mobil and Cliffs were engaged in discussions about the terms of an additional effort to reach turnkey depth. These discussions constituted Mobil's request to redrill. The simultaneous discussions between Cliffs and Underwriters further demonstrate Cliffs' recognition of the request and of their obligations under the contract.
3) After Cliffs walked, and it was obvious that Cliffs would not perform, no further request to redrill was required. Mobil could regard the contract as dissolved. Civil Code art.2016.
These reasons for judgment evidence two independent breaches of contract: (1) Cliffs' failure to complete the well following a "blowout," caused through its negligence and/or lack of skill; and (2) Cliffs' refusal thereafter to redrill the well in another location. A determination of whether there was a breach of contract in each of these instances involves issues of both contractual interpretation as a matter of law, as well as questions of fact regarding whether the actions of the parties actually constituted the alleged breach under the applicable contractual terms.

The "Blowout" and Failure to Complete the Well
The contract between the parties had as its object the completion of a well to contract depth. Indisputably, Cliffs failed to complete the well. For the reasons cited herein, we agree with the trial court that, as a matter of law, Cliffs did not have the option to walk away from the contract.
Further, the provisions of the contract between the parties set forth various ways in which the contract could be breached during performance: "(a) unreasonably slow progress, carelessness, inattention or incompetency on the part of [Cliffs] in the performance of the work or (b) if [Cliffs] should fail, neglect, refuse or be unable at any time during the course of the work to provide ample facilities or labor qualified to perform the work hereunder or (c) if the quality of work is deemed unacceptable by Mobil and [Cliffs] is unable or unwilling to take remedial action to improve the quality of the work to levels acceptable to Mobil, or (d) if [Cliffs] shall become insolvent, or (e) insolvency, receivership or bankruptcy proceedings shall be commenced by or against [Cliffs], or (f) [Cliffs] shall assign or transfer this Contract or any right or interest therein, except with the prior written consent of Mobil, or (g) [Cliffs] shall sell or assign substantially all of its business, or (h) if [Cliffs] fails to make payment for services or materials in accordance with the terms thereof and Mobil is notified by the supplier of such services or materials or [Cliffs'] failure, or (i) if [Cliffs] or Mobil is cited for violation of any laws, rules, regulations or ordinances, compliance with which is [Cliffs'] responsibility hereunder or (j) [Cliffs] fails to comply with safety related obligations or (k) subject to force majeure, [Cliffs] is or will be unable to complete the work in accordance with the agreed schedule ...."
*27 A reading of the contract clearly shows the failure of Cliffs to accomplish the purpose of the contract (i.e., to drill the well to the specified depth), due to a lack of skill, was contemplated as a breach of the contract. The testimony in the record reflects that, on the day in question, a "screen" was inadvertently left in the drilling pipe as it was lowered into the hole. When the worker lowering the pipe realized what had happened, he began to pull the pipe back out of the hole. Thereafter, his supervisor ordered him to pull the pipe out at a much faster rate of speed. Expert testimony in the record indicated that pulling the pipe out too quickly caused the well to "blowout." Thus, there is a reasonable basis in the record from which the trial court could have found the contract between the parties was breached as a result of Cliffs' failure to complete the well, as well as the faulty workmanship of Cliffs' attempted performance.[16]
The trial court specifically stated that Cliffs breached its contract with Mobil by failing to drill the well to turnkey depth. We find no error in the trial court's summary judgment in this respect.[17]
The contract between Mobil and Cliffs clearly states the remedies available to Mobil in the event of a "default" by Cliffs:
[I]n the event [Cliffs] shall breach a material representation or obligation of this Contract, the parties shall have the following rights, obligations and duties:
(i) Mobil may give [Cliffs] written notice of its intent to terminate unless [Cliffs] shall remedy the default within a time specified by Mobil. If [Cliffs] has not remedied said default within such time, Mobil may, upon written notice to [Cliffs] terminate this Contract without prejudice to any other of its rights or remedies at law or in equity.
(ii) Mobil shall have the right to take the possession of the well, discontinue the drilling thereof, and at its option, dismantle or abandon same without any liability on its part for any portion of the agreed price.
(iii) Mobil shall have the right to take possession of the well and any or all of [Cliffs'] tools, machinery and equipment then at the well and through its own employees or some other contractor, drill such well to completion. [Cliffs] shall, if required by Mobil, withdraw from the site and assign to Mobil such of [Cliffs'] subcontractors as Mobil may request and shall remove such materials, equipment, tools and instruments used by [Cliffs] in the performance of the work as Mobil may direct.
Further, the contract provides for damages due upon Cliffs' default: "[Cliffs] shall be liable for any excess cost of the work incurred by Mobil on account of termination for any of the causes set forth *28 above." (Emphasis added.) The jury in this case determined that the excess cost to drill the St. Mary No. 2 well was $4,756,598. Therefore, this amount is the contractually agreed upon measure of damages in the instant case.[18]
We reject defendants' arguments that summary judgment was inappropriately granted on the issue of breach of contract. The provisions of the contract were clear, the facts of the incident were not in genuine dispute, and the application of the contract to the facts revealed breach of its provisions. Therefore, we conclude the summary judgment of the trial court was appropriately granted.[19]

Redrill
Cliffs maintains there was a question of fact as to whether it had an obligation under the contract to redrill the failed well. However, Cliffs' argument in this respect is premised on its position that either its error as to the terms of the agreement allows the court to read into the contract the disputed "Gulf Coast" clause,[20] which we have rejected hereinabove as meritless, and/or its position that the terms of the contract implicitly contained a right on the part of Cliffs to walk away from the contract without further obligations.[21] We likewise find these arguments to be meritless.
The language of the contract provided:
16.5 The holeturnkey basis: Should the hole for any cause attributable to Contractor's operations be lost or damaged while Contractor is engaged in the performance of work hereunder on a turnkey basis, all such loss or damage to the hole shall be borne by Contractor. If the hole is not in condition to be carried to the contract depth provided for herein, Contractor shall properly plug and abandon the hole, and, if requested by Mobil, commence a new hole without delay at Contractor's cost. The drilling of the new hole shall be conducted under the terms and conditions herein in the same manner as though it were the hole that had been lost or damaged. In such case, Contractor shall not be entitled to any payment or compensation for expenditures made or incurred by Contractor in connection *29 with the abandoned hole except for daywork earned by coring, testing and logging said well or other daywork for which Contractor would have been compensated had such hole not been lost and abandoned. Contractor shall replace all casing or material furnished by Mobil which cannot be economically recovered and reused in the new replacement hole. [Emphasis added.]
The contract places no specific requirement as to the format of Mobil's request for a redrill. It is undisputed that, after the blowout of the first well, Mobil and Cliffs negotiated for a redrill of the well by Cliffs. Cliffs offered to redrill the well for an additional fee of $970,000. Inherent in such negotiations was the desire of Mobil that the well be redrilled. Communications between the parties in this respect clearly reflect that Mobil desired a redrill and that the only variable was the decision of Cliffs whether, and under what circumstances, it would comply.
We likewise find no merit in Cliffs' assertion that it was only required under the contract to redrill under the same terms and conditions as applied to the hole it contracted itself to drill (St. Mary No. 1) and that Mobil's planned redrill of the hole with a larger and more expensive casing system negated its obligation to redrill under the contract. We reject this argument. Based upon the plaintiffs' expert testimony, obviously credited by the trier-of-fact, the planned larger casing system on the redrill was necessitated by the higher pressures in the surrounding geological formations, caused by the underground blowouts attributable to Cliffs' negligence. This fault of Cliffs, which impaired the reservoir, rendered a redrill on the very same terms and conditions a practical impossibility or a predictable, costly failure. Cliffs cannot find relief from its contractual obligation to redrill relying on the onerous conditions created by their own fault.
Moreover, we find it particularly relevant to the understanding of the parties, at the time the contract was confected, that Cliffs purchased redrill insurance, and subsequently collected a benefit under this insurance. The insurance policy purchased by Cliffs states that:
In respect of wells insured hereunder and in consideration of payment of an additional premium of $Included [sic] and subject to all terms and conditions and exclusions stated therein and the Combined Single Limit of Liability applicable thereto, Sub-Section B of this policy is endorsed to cover reimbursement to the Assured for actual costs and expenses reasonably incurred to restore or redrill a well insured hereunder, or any part thereof, which has been lost or otherwise damaged as a direct result of physical loss of or damage to the drilling and/or workover and/or production equipment and/or platform by lightning; fire, explosion or implosion above the surface of the ground or water bottom; collision with land, sea or air conveyance or vehicle; windstorm, collapse of derrick or mast; flood; strikes; riots; civil commotions or malicious damage; and where covered under Sub-Section A, earthquake, volcanic eruption or tidal wave, and in respect of offshore wells only, collision or impact of anchors, chains, trawlboards or fishing nets.
Cliffs' insurers paid to Cliffs, on or about July 30-31, 1996, $3.15 million under the terms of this policy in exchange for Cliffs' assurance that it would not undertake redrilling operations.
Thus, we conclude the trial court was correct in determining that there was an obligation on the part of Cliffs to redrill *30 and that this obligation was intentionally breached.

UNFAIR TRADE PRACTICE CLAIM
An action under the Louisiana Unfair Trade Practices Law is based on La. R.S. 51:1405(A), which declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Generally, a practice is considered unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers or business competitors. Family Resource Group, Inc. v. Louisiana Parent Magazine, XXXX-XXXX, p. 7 (La. App. 1 Cir. 11/9/01), 818 So.2d 28, 32; Inka's S'Coolwear, Inc. v. School Time, L.L.C., 97-2271, p. 10 (La.App. 1 Cir. 11/6/98), 725 So.2d 496, 501. However, what constitutes an unfair trade practice is determined by the courts on a case-by-case basis. Copeland v. Treasure Chest Casino, L.L.C., XXXX-XXXX, p. 4 (La.App. 1 Cir. 6/21/02), 822 So.2d 68, 71; Jarrell v. Carter, 577 So.2d 120, 123 (La.App. 1 Cir.), writ denied, 582 So.2d 1311 (La.1991). Mere negligence is not enough to sustain a cause of action for unfair trade practices. Pizzaloto v. Hoover Company, 486 So.2d 124, 127 (La.App. 5 Cir.), writ denied, 488 So.2d 202 (La.1986).
A right of action is conferred on any person, who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, by La. R.S. 51:1409, for actual damages resulting from unfair trade practices, in addition to court costs and attorney fees.[22]
After a thorough review of the record, we find no error in the factual finding of the jury that Cliffs engaged in unfair trade practices with respect to plaintiffs. Cliffs was under a contractual obligation to disclose any insurance claims that it made with its insurer to Mobil.[23] Nevertheless, Cliffs engaged in negotiations with Mobil, leading Mobil to believe it intended to attempt a redrill of the failed well at another location, while at the same time, Cliffs was negotiating a settlement with its insurers under its coverage for redrill obligations. Furthermore, after obtaining $3.15 million in settlement with its insurers and failing to reach an agreement with Mobil to actually redrill the well, Cliffs pocketed the funds allocated for a redrill, with no disclosure or disbursement of same to Mobil. We conclude the trier of fact did not err in finding these actions to be a violation of the unfair trade practices law. Thus, the award for plaintiffs' actual loss, consisting of the excess cost of the redrill, loss of the insurance proceeds, along with costs and attorney fees, was proper and will not be disturbed.

LOSS OF HYDROCARBONS
An award was made to the plaintiffs and the State in the amount of $17,000,000 for loss of hydrocarbons, on the basis of Cliffs' negligence in the blowout of the well. We will address the awards to the Mobil plaintiffs, *31 the St. Mary plaintiffs, and the State separately.

Award to Mobil Plaintiffs[24]
The contract between Cliffs and the Mobil plaintiffs provided in Section 15 as follows:

CONSEQUENTIAL DAMAGES:
15.1 Neither party shall be liable to the other party for special, indirect or consequential damages resulting from or arising out of this Contract, including, without limitation, loss of profit, revenue, damage to the reservoir, production or business interruptions, however same may be caused.
In awarding Mobil damages for loss of hydrocarbons, the trial court reasoned that the contract provisions did not apply since Cliffs should not be allowed to avail itself of a contract that it breached, citing La. C.C. art.2016.[25] We do not agree. The trial court mischaracterizes the purpose of La. C.C. art. 2016, which is to relieve an obligee of any further performance under the contract when the obligor has failed to perform. The effects of dissolution of the contract under La. C.C. art.2016 are recited in La. C.C. art. 2018, which provides, in pertinent part: "Upon dissolution of a contract, the parties shall be restored to the situation that existed before the contract was made. If restoration in kind is impossible or impracticable, the court may award damages." Comment (c) to article 2018 states, "Under this Article, if an obligor can no longer perform after rendering a substantial part of the performance, he is entitled to recover for that performance according to the terms of the contract, and the other party is entitled to damages for the unperformed part."
In the instant case, the trial court deemed it appropriate to award damages without regard to the parties' contractual provision for damages. To this extent the court erred. Laws on the same subject matter must be interpreted in reference to each other. La. C.C. art. 13. While La. C.C. arts.2013 et seq. authorize dissolution of a contract for failure of performance and provide for damages in appropriate circumstances, La. C.C. arts.2005 et seq. provide for instances in which the parties have provided in advance, contractually, for the measure of damages due upon default by one of the parties. The fact that the contract was breached does not render inoperative the contractual provisions governing breach; otherwise that portion of the contract becomes meaningless.
The contract between the parties is the law between the parties under La. C.C. art.1983, and where it provided or prohibited certain remedies in the event of a breach of contract, those provisions must be given effect. "Parties may stipulate the damages to be recovered in case of nonperformance, defective performance, or delay in performance of an obligation. That *32 stipulation gives rise to a secondary obligation for the purpose of enforcing the principal one." La. C.C. art.2005. "Stipulated damages may not be modified by the court unless they are so manifestly unreasonable as to be contrary to public policy." La. C.C. art.2012.
The supreme court explained this concept in Lombardo v. Deshotel, 94-1172, pp. 5-6 (La.11/30/94), 647 So.2d 1086, 1090, as follows:
When the creditor elects to sue the debtor for damages, when specific performance is impracticable, or when the court refuses within its discretion to grant specific performance of an obligation to do, the fixing of the amount of the indemnity accorded as damages is made in two ways: (1) By the court, after the nonperformance is established. C.C. Art.1999; 2 Planiol no. 246; or (2) By the parties themselves, in advance, by a stipulated damages clause inserted in the contract. C.C. Art.2005; Cf., 2 Planiol no. 246; See 4 Aubry et Rau, Droit Civil Francais, in 1 Civil Law Translations pp. 91-92 and pp. 120-122 (1965)[.] The sum stipulated in the clause replaces the need for the damages to be set by the court. Stipulated damages may not be modified by the court unless they are so manifestly unreasonable as to be contrary to public policy, C.C. Art.2012; Cf., 2 Planiol nos. 255-266; 4 Aubry et Rau at 121-122; 2 Litvinoff § 9, or if the obligor has partially performed. C.C. Art.2011. [Emphasis added.]
Thus, the trial court should have allowed the contractual provisions, intended to provide and/or limit the measure of damages in the event of a breach of contract, to govern the award of damages.
In the instant case, the contract between the parties specifically provided that the measure of damages for the failure to complete the well was the recovery of the excess funds required to be expended by Mobil to obtain the redrilling of the well. This amount was awarded and affirmed as noted herein. However, the contract also prohibited the recovery of specific types of damage in the event of breach of contract, by providing that there would be no recovery "for special, indirect or consequential damages resulting from or arising out of this Contract, including, without limitation, loss of profit, revenue, damage to the reservoir, production or business interruptions, however same may be caused."
This provision governing stipulated damages can be disregarded only if it is "so manifestly unreasonable as to be contrary to public policy." See La. C.C. art.2012. Further, La. C.C. art.2004 provides, "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party. Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party." (Emphasis added.)
Similar exclusory damage clauses have been examined by Louisiana courts previously in: Massey v. Decca Drilling Company, Inc., 25,973 (La.App. 2 Cir. 12/7/94), 647 So.2d 1196, writs denied, 95-0069, 95-0411, 95-0417 (La.4/21/95), 653 So.2d 563, 564, and Sevarg Co. v. Energy Drilling Co., 591 So.2d 1278 (La.App. 3 Cir. 1991), writ denied, 595 So.2d 662 (La. 1992).
In the Massey v. Decca Drilling Company, Inc. case, the drilling company was asked to cease drilling and remove its rig after the operator determined that satisfactory progress had not been made on the well depth. 25,973 at p. 3, 647 So.2d at 1199. During the dismantling of the oil rig, several disgruntled employees of the drilling company intentionally placed approximately thirty feet of debris (bolts, *33 tubing, and other metal pieces) in the well, causing four days of work and costing $44,000 to remedy the obstruction. In the suit for recovery of damages, the drilling company pointed to a provision in the drilling contract that prohibited the recovery of "consequential damages."[26] Although the term was not defined in the contract, the court interpreted the provision as covering the circumstance of junk being thrown into the well, but declined to apply the provision to relieve the drilling company of liability. In so holding, the court referred to the actions of the drilling employees as "sabotage" and determined that "the parties did not intend to prohibit an award of consequential damages for an intentional tort." Massey v. Decca Drilling Company, Inc., 25,973 at p. 14, 647 So.2d at 1203-4.
In Sevarg Co. v. Energy Drilling Co., a provision identical to that considered in Massey was at issue. In that case, the operator sued the drilling company, alleging that the drilling company's "failure to comply with the terms of the contract resulted in skin damage, which in turn inhibited production ... [and] that [the drilling company] intentionally maintained deficient mud properties in order to accelerate the drilling process and to save money for itself." The operator further alleged that "the skin damage was caused by the defendant through its intentional and bad faith breach of the contract." Sevarg Co. v. Energy Drilling Co., 591 So.2d at 1279. In response to the petition, the drilling company filed a peremptory exception raising the objection of no cause of action, based on the exclusory damage provision in the contract between the parties. The objection was partially maintained by the trial court and several items of damage were stricken from the petition. Sevarg Co. v. Energy Drilling Co., 591 So.2d at 1279-80. In reversing the trial court, the appellate court determined that the plaintiff had stated a cause of action for damages based on gross fault that would be recoverable, even if excluded by the contract, if the provisions of La. C.C. art.2004 were met. In so holding, the court defined "gross fault" as "that which proceeds from inexcusable negligence or ignorance; it is considered as nearly equal to fraud," citing former La. C.C. art. 3556(13). Sevarg Co. v. Energy Drilling Co., 591 So.2d at 1281.
We find both the Massey and the Sevarg cases to be distinguishable from the instant case on their facts. Both involved purportedly intentional acts and/or grossly negligent acts. In the instant case, the loss of hydrocarbons and/or damage to the Mobil/St. Mary reservoir arose from the simple negligence of Cliffs in causing the well blowout and failing to properly control same. There is no factually supportable allegation that this negligence rose to the level of gross negligence, as defined by the Sevarg court. Hence, we are unable to say the exclusion of damage provision contained in the Mobil/Cliffs contract was against public policy or unenforceable.
Therefore, we conclude that it was legal error for the trial court to award to Mobil damages for loss of production of hydrocarbons, in contravention of the terms of the contract.[27]

*34 Award to St. Mary Plaintiffs[28]
As noted hereinabove, the St. Mary plaintiffs originally joined in the petition of the Mobil plaintiffs, asserting both a cause of action in contract and a cause of action in tort. However, the St. Mary plaintiffs later filed an amending petition, on their own behalf, separate and apart from the Mobil plaintiffs, and with separate counsel. In this amending petition, the St. Mary plaintiffs dropped their claim under the contract executed between Mobil and Cliffs, and thereafter, asserted only a tort claim.
In brief to this court, St. Mary likens its position to that of the State, arguing, "There is no assertion or evidence to suggest that either St. Mary Land or the State had any connection in any manner with the contract between Mobil and Cliffs. There is no basis to even suggest that St. Mary Land is a third party beneficiary to the contract." Cliffs contends in its reply brief that "Mobil contracted with Cliffs for itself and as authorized agent for... St. Mary Operating Co. (SMO), under the Joint Operating Agreement (JOA) ... and Mobil was denominated Operator to act on behalf of ... SMO at all times pertinent to this litigation. Under the JOA, Cliffs claims the parties agreed to share all costs and expenses and losses arising from their joint venture."[29] (Footnotes omitted.) We join St. Mary in decrying the sparse evidence in the record on this point, but we stop short of concluding the evidence is lacking entirely.
A contracting party may stipulate a benefit for a third person called a third party beneficiary. Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary's agreement. La. C.C. art.1978. Under this article, the beneficiary's intention to accept the benefit may be made known in any manner, even impliedly. La. C.C. art.1978, 1984 Revision Comments, Comment (b). The stipulation gives the third party beneficiary the right to demand performance from the promisor. Also the stipulator, for the benefit of the third party, may demand performance from the promisor. La. C.C. art. 1981. The promisor may raise against the beneficiary such defenses based on the contract as he may have raised against the stipulator. La. C.C. art.1982.
While the list of exhibits proposed to be submitted to the trial court at trial lists the "[JOA] among certain of the plaintiffs and all amendments thereto" as an anticipated submission, the record does not reflect that the agreement was introduced into evidence at the trial of the matter, though a copy of what appears to be this agreement is attached to a motion for summary judgment filed by Cliffs and its insurers. This agreement provides for St. *35 Mary's participation in the profit and loss of the well to be drilled, and requires the operator (Mobil) to drill the well "on a competitive contract basis at the usual rates prevailing in the area." The circumstances under which the operator could be removed by the non-operators were provided for in the JOA. The JOA obviously intended that any contract entered into by Mobil for the drilling of the well would benefit St. Mary.
Nevertheless, even if this document was not properly introduced into evidence at the trial of the matter, we find other evidence in the record that tends to support Cliffs' position.
In the Mobil contract, Mobil named itself as the "operator" of the property on which the well is to be drilled. Additionally, in the "Insurance" section of the contract, it is stated:
Mobil, its co-lessees and joint interest owners, their respective parent and/or affiliated companies, and their respective employees, servants and agents to the same extent as Mobil, shall be named additional insureds with a waiver of subrogation in favor of Mobil, its Affiliates and their employees with respect to comprehensive general liability policies.
The "co-lessees" are referred to again in the indemnity section of the contract.
Implicit in the concept of Mobil as "operator" of the drilling operation, on the property in question, is the underlying fact that Mobil was acting not only on its own behalf but on behalf of the property owners with whom it presumably had an operating agreement. Also, the contract explicitly stipulated a benefit for the "joint interest owners" and/or "co-lessees" in the insurance and indemnity sections of the contract.[30]
The evidence in the record reflects that the contract between Mobil and Cliffs obviously contemplated that Mobil's joint interest owners would be third party beneficiaries of the contract. Consequently, we conclude that the St. Mary plaintiffs were third party beneficiaries of the contract between Mobil and Cliffs.
In order for the consequences of La. C.C. arts.1978-1982 to be triggered, the third party must evidence his intent to avail himself of the stipulated benefits. Even aside from the participation in the JOA, we find evidence in the record to suggest that St. Mary did intend to avail itself of the benefits of the Mobil/Cliffs contract. In correspondence from St. Mary to Mobil, subsequent to the blowout, St. Mary made the following statements:
This letter is written to you by St. Mary Land & Exploration Company ("St. Mary") in both its capacity as the representative of St. Mary Operating Company, a party to that certain joint operating agreement dated January 11, 1995, ("JOA") pertaining to the above-referenced well, and as your lessor....

* * *
... Circumstances such as Mobil's unilateral decision to release the Falcon rig that was on location in direct contravention of the agreement of all the parties, which unilateral decision was not communicated until after the fact, can no longer be tolerated.

*36 In light of the existing downhole blowout, Mobil must begin to demonstrate that it will act as a reasonably prudent operator .... It further means that Mobil must communicate with both its lessor, and its co-working interest owners. If Mobil continues to refuse to act as a reasonably prudent operator under the existing circumstances, then it will leave St. Mary ... no choice but to remove Mobil as Operator in accordance with the provisions of Article V. of the JOA.... [Emphasis added.]
In addition to this letter, several "Partners Meeting" agendas for various dates were introduced into evidence showing the attendance of St. Mary representatives. Further, in a letter from Samuel Gary Jr. & Associates, Inc. to Gary-Williams Production Company, it was stated: "As discussed with you, Mobil, St. Mary and Gary are strongly in favor of Alternative II as outlined by Cliffs' letter...."
This evidence, when taken as a whole, illustrates that St. Mary was a very active participant in the drilling process at issue herein, and that St. Mary obviously considered itself a beneficiary of the contract between the operator and Cliffs, and believed it had the right and authority to direct and/or relieve Mobil of its duties as operator. If St. Mary were to have exercised its asserted right to relieve Mobil as operator, would St. Mary then have assumed the position itself or appointed another to act in its behalf? Regardless of the answer to such a question, the underlying premise is clear; i.e., Mobil was acting on behalf of St. Mary, who was clearly a third party beneficiary to Mobil's contract with Cliffs and who had exercised significant control over the operations.
Consequently, we must conclude that La. C.C. art.1982 applies to allow Cliffs to raise any defense against St. Mary that it could raise under the terms of the contract against Mobil. As concluded hereinabove, the contractual terms expressly limit the nature of damages recoverable in the event of a breach of contract, and exclude "loss of profit, revenue, damage to the reservoir, production or business interruptions, however same may be caused." Therefore, we conclude that the award to St. Mary for damage to the production of hydrocarbons on its property was contractually excluded and awarded in error.

Award to the State
Since there existed no contract between the State and Cliffs, any remedy the State has against Cliffs for damage to its property arises under La. C.C. art. 2315 et seq. and La. R.S. 31:10.[31] Therefore, we must examine whether the State's loss of an ownership interest in hydrocarbons to be produced from the property at issue was sufficiently proven.
At the outset, we reject the argument of Cliffs that damages can be recovered only for hydrocarbons actually reduced to possession. Cliffs cites La. R.S. 31:6, which provides, "Ownership of land does not include ownership of oil, gas, and other minerals occurring naturally in liquid or gaseous form, or of any elements or compounds in solution, emulsion, or association with such minerals. The landowner has the exclusive right to explore and develop his property for the production of such minerals and to reduce them to possession and ownership."
We believe this argument overlooks the provisions of La. R.S. 31:10 and *37 the comments thereto, which we interpret as lending sufficient authority for the proposition that one who damages another's enjoyment of the right to extract minerals from his property is liable for damages therefor. Section 10 provides, "A person with rights in a common reservoir or deposit of minerals may not make works, operate, or otherwise use his rights so as to deprive another intentionally or negligently of the liberty of enjoying his rights, or that may intentionally or negligently cause damage to him. This Article and Article 9 shall not affect the right of a landowner to extract liquid or gaseous minerals in accordance with the principle of Article 8." The comments to article 10 state:
Article 10 is a limited restatement of the obligation of good neighborhood contained in Article 667 of the Louisiana Civil Code. It views the relationship between those with rights in a common source of supply as one of neighborhood. It is to be noted that the phrasing of Article 10 is both broader and more limited than that of Article 667 of the Civil Code, which merely states that a proprietor may not "make any work ..., which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of damage to him." Article 10, however, provides that one owning rights in a common source supply of minerals may not "make works, operate, or otherwise use his rights so as to deprive another of the liberty of enjoying his rights or that may cause damage to him." The intent is to assure that the article will not be limited in its application to making works as such but will govern the entire range of exploratory and extractive activities in a common source of supply of minerals.
The applicability of the principle of Article 667 of the Civil Code to mineral matters in Louisiana is sustained in the case of Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206 (1919), in which a landowner left a well uncapped to decrease the pumping efficiency of his neighbor's well. An injunction was granted against such conduct. See also Adams v. Grigsby, 152 So.2d 619 (La.App. 2d Cir.1963).

In Anglo-American jurisdictions oil and gas decisions have granted relief for waste of the common resource resulting from various causes. See Kuntz, "Correlative Rights of Parties Owning Interest in a Common Source of Supply of Oil and Gas," 17th Inst. on Oil and Gas Law and Taxation, 229 et seq. (1966). Relief has also been granted where an attempt was made to disguise waste beneath the cover of a sham, low magnitude economic utilization of resources. Louisville Gas Co. v. Kentucky Heating Co., 117 Ky. 71, 77 S.W. 368 (1903). Similarly, an owner of rights in a common source of supply has been protected against negligent waste of the common resource, as for example by a blowout which due care could prevent. Eliff [Elliff] v. Texon Drilling Co., 146 Tex. 575, 210 S.W.2d 558 (1948). There does not, however, seem to be any instance to date in which courts have been willing to impose liability for waste of the common source of supply without either intent or negligence. This reflects a determination that the public interest in utilization of the resources is such that the ordinary risks of waste occasioned by occurrences which are not the result of intent or negligence should not be shifted from one party engaged in extraction to others engaged in the same utilitarian endeavor. It is in this sense, in view of the general jurisprudence, that Article 10, of the Mineral Code is more limited than Article 667 of the Civil Code. Under *38 Article 10, the obligations of those having correlative rights in a common source of minerals result in liability only if damage is intentionally or negligently caused. The fact that ordinary risks have not been shifted among those engaged in extraction does not, however, mean that relief cannot be granted if, once an event has taken place, an operator does not take reasonable steps to remedy a situation resulting in waste. If, for example, a producing formation is menaced by a blowout resulting from an unavoidable accident causing waste of the common resource, the operator suffering the accident cannot fail to take all necessary and reasonable measures to minimize the damage to other interests in the common source of supply. Larkins-Warr Trust Co. v. Watchorn Petroleum Co., 198 Okla. 12, 174 Pac.2d [P.2d] 589 (1946).
Other cases in Anglo-American jurisdictions have dealt with spoilage of the common reservoir. For example, excessive rates of withdrawal causing intrusion of water in the producing formation, Manufacturers Gas and Oil Co. v. Indiana Natural Gas & Oil Co., 155 Ind. 461, 57 N.E. 912 (1900); failure to plug an abandoned well, permitting intrusion of water, Atkinson v. Virginia Oil & Gas Co., 72 W.Va. 707, 79 S.E. 647 (1913); and negligence in "shooting" a well, Commanche Duke Oil Co. v. Texas & Pacific Coal Co., 298 S.W. 554 (Tex. Comm.1927), have all been situations warranting relief. These types of conduct can cause damage either to production or energy rights or both.
Modern techniques of pressure maintenance and secondary recovery are beginning to cause problems in other jurisdictions. In one instance, water flood operations deprived an owner of his right to primary production, and relief was granted. Tidewater Oil Co. v. Jackson, 329 [320] F.2d 157 (10th Cir.1963).
This brief review of cases involving correlative rights in other jurisdictions is not intended to suggest that the Louisiana Supreme Court must necessarily adopt the holding of any or all of those cases as a result of the enactment of Article 10. The review is given merely to point out the general nature of the doctrine of correlative rights and the types of interests which have been protected in other states. It is believed that this article furnishes the necessary flexibility to Louisiana courts to deal with problems of correlative rights in a common source of supply of oil, gas, or other minerals in Louisiana, and it is thus intended that this device be used to make it clear that correlative rights of those with interests in a common source are protected.

It should be noted that if by exercise of the policy power the correlative rights of the parties are regulated or fixed by an administrative agency, the rule of private property in Article 10, limiting liability to intentionally or negligently caused damage would not excuse the party for violation of the regulatory order.

The reference to Article 8 is intended to assure that although the obligation of neighborhood exists, the so-called "rule of capture" as stated in Article 8 will not be infringed by application of Articles 6 and 7. Thus, a landowner conducting lawful operations on his own property is not in violation of his obligation of good neighborhood simply because some of the fugitive minerals that he recovers may have been drawn from beneath land belonging to another. It should be noted, however, that the Louisiana Supreme Court has held that although the rule of capture protects a landowner *39 or one procuring rights from him in reducing minerals to possession even though migration from the land of another may result, if intentional or negligent conduct damages the property values of another as a result of waste of the common source of supply, the party damaged has a cause of action for such diminution of his property value. McCoy v. Arkansas Natural Gas Co., 175 La. 487, 143 So. 383 (1932).
The rule of capture is not applicable to solid minerals. Article 13 provides that a landowner may recover for unauthorized withdrawal of such minerals "by any means." Therefore, the limiting words of Article 10 referring to Article 8 are applicable only to the fugitive minerals. [Emphasis added.]
We find that La. R.S. 31:10 provides a remedy to a person with rights in a reservoir when the value of his rights has been diminished by the negligent or intentional acts of another. This right has been recognized in Huggs, Inc. v. LPC Energy, Inc., 889 F.2d 649, 657 (5 Cir.1989), citing Breaux v. Pan American Petroleum Corp., 163 So.2d 406 (La.App. 3 Cir.), writ denied, 246 La. 581, 165 So.2d 481 (1964). Accordingly, we conclude that Cliffs' activities in drilling the well in question fell within the purview of La. R.S. 31:10; Cliffs is therefore liable for the damage it caused the State by its negligence.
It is well established that a trial court's finding of fact may not be set aside on appeal unless there is no reasonable factual basis in the record for the finding and the finding is clearly wrong (manifestly erroneous). Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Furthermore, when there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). On appellate review, if an appellate court makes a determination that the trial court's findings are reasonable in light of the record reviewed in its entirety, then the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart, 617 So.2d at 882-883. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
After a thorough review of the extensive testimony and evidence presented at trial, we conclude that the trial court had a reasonable evidentiary basis for finding that a considerable amount of hydrocarbons, that would otherwise have been available for commercial production, were lost as a result of the underground blowout caused by the negligence of Cliffs and Cliffs' subsequent faulty efforts to control the blowout. Plaintiffs presented expert witness testimony, which the trier-of-fact accepted as credible, that some thirty-six billion cubic feet of hydrocarbons were lost when geologic formations fractured, allowing the gas to dissipate into adjacent formations. Defendants maintain such testimony was purely speculative and/or based on defective data. We are unable to say the factfinder's choice between the two views of the evidence was clearly wrong. Accordingly, we affirm the finding as to the damage sustained by the State in the impairment of its right to produce hydrocarbons from the reservoir in question.

COMPARATIVE FAULT
In its final assignment of error, Cliffs asserts that the trial court erred in denying Cliffs the opportunity to put on evidence at trial of the comparative fault of *40 Mobil. In particular, Cliffs alleges it presented the trial court with evidence that Mobil was negligent in the following respects: (1) Mobil failed to act as a "reasonably prudent operator" in connection with the underground blowout; (2) Mobil failed to promptly and prudently commence and drill a proposed relief well and unreasonably failed to take an assignment of Falcon Rig No. 55, thus causing or contributing to its own damages;[32] (3) Mobil had proprietary access to geologic, seismic, well log and other information that Cliffs did not have and wrongfully refused to share that information with Cliffs to guide either its planning and design of the well or its attempts to control the underground blowout; (4) Mobil was negligent in exercising its duties under its own form of the turnkey drilling contract, including an obligation to specify the actual setting points for the casing and the well, amount of cement, and cementing process; (5) Mobil withheld from Cliffs its reservations concerning Cliffs' plan to kill the well after the underground blowout;[33] and (6) Mobil reviewed, discussed and approved the plug and abandonment procedure for the well proposed by Cliffs, had reservations in respect thereof based upon its proprietary knowledge, and failed to apprise Cliffs of those reservations.[34] Cliffs argues that this limitation by the trial court on the evidence that it could adduce, along with the trial court's repeated statements in open court regarding "Cliffs' breach of contract as a matter of law," prejudiced the jury against Cliffs.
Having resolved the issue of plaintiffs' tort claim against Cliffs in Cliffs' favor, for the reasons stated hereinabove, we find any error in the failure of the trial court to allow the introduction of evidence of the comparative fault of Mobil to have been harmless. To reiterate, we have concluded that plaintiffs' claims, excepting tort damages awarded to the State, for damages for loss of hydrocarbons were inappropriately awarded to plaintiffs in contravention of the contract between the parties.
Nevertheless, as this argument relates to the tort recovery of the State, we must consider whether La. C.C. art. 2323 mandated that the fault of Mobil be quantified. Based on the arguments presented to the trial court, the trial court struck Cliffs' affirmative defense of Mobil's negligence, finding Mobil breached no duty and therefore was not at fault in the factual scenario at issue.
Our review of the hearing transcript, on what was termed at the hearing as a motion to strike,[35] reveals that Cliffs presented the following arguments to the trial court in support of maintaining its right to present the issue of Mobil's comparative fault to the jury: (1) Mobil was negligent in failing to control the casing and cementing aspect of Cliffs' performance under the contract; (2) Mobil failed to act as a reasonably *41 prudent operator by closely monitoring Cliffs' performance under the contract; (3) Mobil was negligent in failing to disclose all geological information in its possession; and (4) Mobil was negligent in the plugging and abandonment of the well by failing to control the underground flow of hydrocarbons, which was estimated at seventy-one million cubic feet per day.
The trial court ruled from the bench, with regard to the allegations that Mobil should have more closely monitored or controlled Cliffs' performance under the contract, essentially that the nature of contract between the parties was such that Mobil had no duty to oversee Cliffs' operations, as all aspects of the job were contracted to be performed exclusively by Cliffs; we find no error in this holding. With respect to the allegation that Mobil failed to disclose all of the geological information in its possession, we find no evidence in the record to support a genuine issue of material fact on this point. Witnesses from Cliffs as well as Mobil basically testified that all information necessary for the design of the well by Cliffs had been provided to Cliffs by Mobil. Hence, we find no merit in this argument. We also reject the allegation that Mobil had the duty to do something to control the underground flow of hydrocarbons when Cliffs plugged and abandoned the well, finding no support in the record for the proposition that Mobil possessed the capability to do what Cliffs was unable to do, under the factual circumstances present at that time.
We decline to address the additional arguments raised for the first time on appeal, pointed to at the outset of this discussion, made in support of this assignment of error, since these arguments were not presented to the trial court. See Howze v. Howze, 98-1544, p. 3 (La.App. 1 Cir. 12/28/98), 727 So.2d 586, 587, vacated on other grounds, 99-0852 (La.5/26/99), 735 So.2d 619; Salassi v. State, Department of Public Safety and Corrections, 96-0321, p. 6 (La.App. 1 Cir. 11/15/96), 684 So.2d 1014, 1018; Roadrunner Motor Rebuilders, Inc. v. Ryan, 603 So.2d 214, 219-20 (La.App. 1 Cir.1992).
Thus, we conclude the trial court properly granted Mobil's motion to strike Cliffs' affirmative defense of comparative negligence on the part of Mobil.

INSURANCE COVERAGE ISSUES
Although Underwriters' first and second assignments of error have been addressed in conjunction with Cliffs' assignments of error, we find several issues remain with respect to insurance coverage: (1) whether the loss of hydrocarbons was covered as property damage under the policy provisions, and (2) whether the trial court erred in failing to enforce the plain terms and exclusions of the policies.
We first recognize that the Underwriters' argument with respect to coverage for loss of hydrocarbons need only be discussed insofar as it affects the State, as the awards for loss of hydrocarbons to the Mobil and St. Mary plaintiffs are reversed hereinabove. The Underwriters make the argument that only economic loss is involved in this item of damage, and thus is not recoverable as property damage under the terms of the policy. We reject this argument for the reasons stated above; i.e., Louisiana mineral law recognizes a right of recovery for damage to a landowner's right to produce minerals from his property and for damage to a reservoir, as noted supra. Thus, we find no merit in this argument by Underwriters.
The Underwriters next advance various reasons for claiming the policy provisions exclude redrill coverage for *42 plaintiffs: status of the policy as a "marine package policy" (emphasis added); no insurable interest of plaintiffs; lack of plaintiffs' status as an insured; lack of damage; limitation to working interest of Mobil; coverage ended when "Assured cease[d] to have an interest in [a] well;" and, that the policy applied only to offshore, not onshore sites.
We find no merit in the Underwriters' citation of any of these so-called policy exclusions. First, the "marine policy package" was not limited to offshore production endeavors, but covered all operations of Cliffs' worldwide both on land and offshore. Secondly, all "co-venturers" of Cliffs were deemed "assureds,"[36] and plaintiffs' interests in the wells at issue existed after Cliffs walked off the job. Obviously, plaintiffs had an insurable interest in the venture as they risked property loss and related damages. It was stipulated prior to trial that Mobil expended $4,756,598 more to redrill the second well, and thus suffered damage. Finally, the judgment of the trial court limited the recovery to each plaintiff to its respective interest.
While there may have been some limitation of recovery to the co-venturers (Mobil and St. Mary plaintiffs) under the insurance policy for damage to the well, the State sought recovery in tort and is therefore covered under the general liability provisions of the policy(ies) in question.
We note that the trial court, in its judgment, gave "credit for any payment by Cliffs Drilling Company and/or its Underwriters and insurers toward satisfaction of any portion of the Judgment in respect of the excess costs of drilling the St. Mary No. 2 Well." This provision of the judgment is in accordance with La. C.C. art. 1791, which provides that an "obligor may extinguish the obligation by rendering performance to any of the solidary obligees." We believe the obligation of the Underwriters to pay for the redrill was a solidary obligation with respect to the obligees, since either Cliffs or Mobil had the right to seek recovery for same. See La. C.C. art. 1790. To the extent the Underwriters have rendered performance to Cliffs under the redrill coverage, credit is due against the judgment rendered by the trial court.
We conclude the arguments of the Underwriters, based on policy exclusions, are without merit.

APPLICATION OF TEXAS LAW
Mobil contends on appeal that the trial court erred in not permitting plaintiffs to present their claims based on fraudulent conduct under Texas law and in failing to award plaintiffs statutory damages under Texas insurance law.
On this issue, we find it particularly relevant that in the first paragraph of the contract between the parties, it is stated:
The applicable law with respect to the work to be performed will be the law of the State in which said property is located.
The property in the instant case is situated in Louisiana; therefore, the parties effectively selected the law of Louisiana as the law to be applied to any disputes arising under the contract.
It is well established that where the parties stipulate the state law governing the contract, Louisiana conflict of laws principles require that the stipulation be given effect, unless there is statutory or jurisprudential law to the contrary or *43 strong public policy considerations justifying the refusal to honor the contract as written. La. C.C. art. 3540 and its Revision Comments. See also Continental Eagle Corp. v. Tanner & Co. Ginning, 95-295, pp. 2-3 (La.App. 3 Cir. 10/4/95), 663 So.2d 204, 206. See also Francis v. Travelers Ins. Co., 581 So.2d 1036, 1041 (La. App. 1 Cir.), writs denied, 588 So.2d 1114, 1121 (La.1991). A choice of law provision in a contract is presumed valid until it is proved invalid. The party seeking to prove such a provision is invalid bears the burden of proof. Continental Eagle Corp. v. Tanner & Co. Ginning, 95-295 at p.3, 663 So.2d at 206.
We find plaintiffs failed to bear their burden to establish that there were strong public policy considerations that would justify a failure to apply the choice of law provision in the contract. Thus, we conclude the trial court did not err in refusing to apply Texas law to the instant suit.

CONCLUSION
For the reasons assigned herein, the judgment of the trial court is reversed in part, insofar as it awarded the Mobil and St. Mary plaintiffs a portion of the $17,000,000 awarded for lost hydrocarbons; the judgment is affirmed in all other respects. Each party is to bear its own costs of this appeal.
JUDGMENT REVERSED IN PART AND AFFIRMED IN PART.
NOTES
[1] Hon. Walter I. Lanier, Jr., retired, First Circuit Court of Appeal, is serving as judge ad hoc by special appointment of the Louisiana Supreme Court.
[2] Hon. William F. Kline Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[3] Plaintiffs' original petition stated that the date of the blowout was January 14, 1996, but that petition was later amended to reflect the date of January 13, 1996. The testimony in the record supported January 13, 1996 as the date of the blowout.
[4] Plaintiffs, St. Mary Land and St. Mary Operating (referred to herein together as "St. Mary"), filed a second amending petition separately from the other plaintiffs and continued thereafter to file pleadings independent of the other plaintiffs.
[5] The "co-interest owners" were enumerated within the petition as including: Gary-Williams Production Company, M & M Exploration, Inc., KEP Energy Resources, LLC, Base Resources, Inc., Paul B. Melnychenko doing business as St. Croix Exploration Company, Tesuque Bayou, Inc., Naghten Oil & Gas Company, PALC Investments, Inc., Andrew L. Evans, Leigh Crueger & Associates, Inc., and Elm Ridge Exploration Company.
[6] This defendant was further described within the petition as: "certain foreign or alien insurers including Underwriters at Lloyds', various I.L.U. Companies, through Lloyd Thompson Ltd., various I.L.U. Companies through Miller Energy Limited, The Ocean Marine Insurance Company Limited, Phoenix Assurance Public Limited Company, Commercial Union Assurance PLC, The Tokio Marine & Fire Insurance Company (UK) Limited, Compagnie D'Assurances Maritimes, Aeriennes et Terretes (C.A.M.A.T.) Assurances Generales de France Incendie Accidents Reassurances Transport, London & Edinburgh Insurance Company Limited, Threadneedle Insurance Company, Limited, Atlas Assurance Company Limited, The Indemnity Marine Assurance Company, Ltd., Assicurazioni Generali S.p.A., Skandia Marine Insurance Company (U.K.) Limited, and Colonia Insurance Company (UK) Ltd."
[7] This defendant was further described within the petition as: "certain foreign or alien insurers including La Reunion Francaise per Hull & Company, Inc., All American Marine Slip., and New York Marine & General Insurance Co. through Mutual Marine Office, Inc."
[8] This defendant was further described within the petition as: "certain foreign or alien insurers including Underwriters at Lloyds', various I.L.U. Companies, through Lloyd Thompson Ltd., various I.L.U. Companies through Miller Energy Limited, The Ocean Marine Insurance Company Limited, Phoenix Assurance Public Limited Company, Commercial Union Assurance PLC, The Tokio Marine & Fire Insurance Company (UK) Limited, Compagnie D'Assurances Maritimes, Aeriennes et Terretes (C.A.M.A.T.) Assurances Generales de France Incendie Accidents Reassurances Transport, London & Edinburgh Insurance Company Limited, Threadneedle Insurance Company, Limited, Atlas Assurance Company Limited, The Indemnity Marine Assurance Company, Ltd., Assicurazioni Generali S.p.A., Skandia Marine Insurance Company (UK) Limited, and International Insurance Company of Hanover Limited (UK)."
[9] This defendant was further described within the petition as: "certain foreign or alien insurers including La Reunion Francaise per Hull & Company, Inc., All American Marine Slip., and New York Marine & General Insurance Co. through Mutual Marine Office, Inc."
[10] Defendants, Soriero and Aon, were the brokers in these transactions.
[11] The brokers, Soriero and Aon, were later dismissed from the suit by plaintiffs in June of 1998.
[12] The insurers named as judgment debtors were described as those "Underwriters being described in Exhibits "B" (for amounts in excess the $250,000 deductible, with limits of $1,000,000), and Underwriters described in Exhibits "C" (for any amounts in excess of $10,000,000").
[13] The award was made subject to a credit for amounts previously paid.
[14] We note the format of the last signed final judgment to be unclear in its award of $4,756,598 under three separate theories of recovery; i.e., contract, unfair trade practices, and negligence. The judgment appears to award this $4,756,598 amount three times under each of the bases for recovery. However, appellants have not raised this as an issue on appeal; therefore, we do not address this aspect of the judgment.
[15] See also Peterson v. Schimek, 98-1712, p. 9 (La.3/2/99), 729 So.2d 1024, 1031.
[16] In its appellate brief, Cliffs makes the statement, "Mobil never even claimed that the blowout constituted a default under the contract." We find this statement to be inaccurate. Plaintiffs' petition specifically stated, "Cliffs ... breached the Drilling Contract ... [b]y failing to furnish the personnel and equipment, and to perform the services necessary to drill the Well to the contract depth ... [and][b]y failing to use appropriate drilling practices to drill the Well to the contract depth, to maintain control of the Well, to regain control of the Well if lost, and to protect the surface, subsurface, and surrounding property."
[17] Even though the parties argue extensively concerning whether Cliffs was required under the contract to "redrill" the well at another location, we find the resolution of this issue has no bearing on the initial breach of contract that occurred when Cliffs failed to drill the well in the original location.
[18] The difference between the Cliffs contract amount and the amount paid to the third party to successfully drill the well was stipulated prior to trial.
[19] We note that where the failure to perform under a contract is justified, no stipulated damages are owed under La. C.C. art.2008. In the instant case, however, default was due to the negligence of the obligee, and this article does not relieve Cliffs of the provision for stipulated damages in its contract with Mobil.
[20] The inclusion of the "Gulf Coast" clause would allow Cliffs to walk away from the operation, at its option, if, as a practical matter, the job could not be completed at a profit.
[21] Legal commentary on the meaning of a "turnkey contract" in the oil business, points out that in a "standard" turnkey contract the contractor "is given what is commonly called a Gulf Coast Clause, which allows the [contractor] `outs' to cease drilling if certain specified unfavorable conditions are reached." Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Manual of Oil and Gas Terms, pp. 1145-46 (11th ed.2001). This clause is not present in a "no-out" contract, which is usually more costly. The inclusion in the contract between the parties in the instant case of a provision for liquidated damages in the event of default, together with the absence of specific provisions detailing under what conditions Cliffs could walk away from the contract, evidenced the intent of the parties that this particular contract was to be a "no-out" contract.
[22] Treble damages are authorized under the statute when a defendant "knowingly" engages in unfair trade practices. "Knowingly" is defined in La. R.S. 51:1402(10) as meaning an act or practice used such that a reasonably prudent businessman knew or should have known that the act or practice was a violation of the Chapter. The jury in the instant case responded negatively to the interrogatory questioning whether Cliffs intended to injure the plaintiffs, and treble damages were not awarded. No appeal was taken on this issue.
[23] Section 11.2 of the contract between the parties provided that "Contractor shall ... within twenty-four hours after the occurrence, provide Mobil with reports or other documents filed or provided to Contractor's insurers...."
[24] Mobil Exploration & Producing U.S. Inc., Mobil Producing Texas & New Mexico Inc., Mobil Oil Exploration & Producing Southeast Inc., Mobil Exploration and Producing North America Inc., St. Mary Land & Exploration Company, St. Mary Operating Company, and Samuel Gary Jr. & Associates, Inc, and its "co-interest owners" (Gary-Williams Production Company, M & M Exploration, Inc., KEP Energy Resources, LLC, Base Resources, Inc., Paul B. Melnychenko doing business as St. Croix Exploration Company, Tesuque Bayou, Inc., Naghten Oil & Gas Company, PALC Investments, Inc., Andrew L. Evans, Leigh Crueger & Associates, Inc., and Elm Ridge Exploration Company).
[25] Louisiana Civil Code article 2016 provides, "When a delayed performance would no longer be of value to the obligee or when it is evident that the obligor will not perform, the obligee may regard the contract as dissolved without any notice to the obligor."
[26] The contractual provision in question provided, in pertinent part, "Neither party shall be liable to the other for special, indirect or consequential damages resulting from or arising out of this Contract, including, without limitation, loss of profit or business interruptions, however same may be caused." Massey v. Decca Drilling Company, Inc., 25,973 at p. 12, 647 So.2d at 1203.
[27] Although this item of damage is referred to as "loss of hydrocarbons," the testimony in the record clearly reflects that the mechanism for the loss was the fracturing of the geological formations in the reservoir that allowed hydrocarbons to escape from commercially producible formations into commercially unproducible formations, which damaged the landowners' exclusive right of production of minerals. Therefore, we find the language of the contract excluding recovery for "damage to the reservoir" and to "production" to encompass the situation at issue herein.
[28] St. Mary Land and St. Mary Operating companies.
[29] We reject St. Mary's argument that the propriety of the award for lost hydrocarbons, with respect to St. Mary, was not properly presented to this court and therefore should not be considered. Although Cliffs' argument on this point was made clearer in its reply brief, Cliffs did state in its original appellate brief to this court that "[t]he district court's award of seventeen million to plaintiffs is clearly erroneous and must be reversed." (Emphasis added.) We find the argument was made generally applicable to all plaintiffs, including St. Mary.
[30] The Louisiana Mineral Code defines "interest owners" in La. R.S. 31:212.31(A)(3) as "a person owning a royalty interest or a working interest in an oil or gas well or unit." St. Mary Operating was a working interest owner pursuant to the terms of the JOA. St. Mary Land was a revenue interest owner pursuant to its ownership of the land and its lease thereof. Thus, both St. Mary companies were Mobil's "joint interest owners" in the well and this benefit was stipulated in their favor.
[31] Although it could be argued that the State was also a third party beneficiary to the contract between Mobil and Cliffs, there is absolutely no evidence in the record to show the State intended to avail itself of this benefit and there was no allegation that the State participated in the Mobil drilling operation.
[32] The record does not reflect that this argument was made before the trial court.
[33] Nor does the record reflect that this argument was made to the trial court.
[34] While some argument was made to the trial court on the propriety of the actions of Mobil with regard to Cliffs' plugging and abandonment of the St. Mary No. 1 well, Cliffs presents a different basis for this argument on appeal.
[35] The issue was first raised in a pleading filed by Mobil, entitled "Motion for Partial Summary Judgment or to Strike Cliffs' Defense of Negligence." The trial court ruled in its judgment that, "The Motion of the Mobil Plaintiffs for Partial Summary Judgment and/or to Strike the Affirmative Defense of Negligence asserted by Cliffs Drilling Company is granted as to all allegations on Mobil's part up to the time Cliffs Drilling Company walked off of the job on the St. Mary No. 1 well."
[36] The fact that the Mobil plaintiffs were insured for redrill coverage was admitted by the representative of the Underwriters at trial.