STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

03-451

WESTLAKE PETROCHEMICAL CO. AND
ZURICH AMERICAN INS. CO.

VERSUS

TMG INDUSTRIAL SERVICES, INC., ET AL.

**********
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2001-1527
HONORABLE WILFORD D. CARTER, DISTRICT JUDGE
**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of John D. Saunders, Marc T. Amy, and Glenn B. Gremillion, Judges.

JUDGMENT VACATED; REMANDED.

Robert E. Landry
Scofield, Gerard, Veron, Singletary & Pohorelsky
P. O. Drawer 3028
Lake Charles, LA 70602
(337) 433-9436
Counsel for Plaintiff/Appellant
    Zurich American Ins. Co.
    Westlake Petrochemical Co.

Ronald Restrepo
Doyle, Restrepo, Harvin & Robbins, L.L.P.
600 Travis St., Suite 4700
Houston, TX 77002
(713) 228-5100
Counsel for Plaintiff/Appellant
    Zurich American Ins. Co.
    Westlake Petrochemical Co.

**Stephen H. Lee**
**Doyle, Restrepo, Harvin & Robbins, L.L.P.**
**600 Travis St., Suite 4700**
**Houston, TX 77002**
**(713) 228-5100**
**Counsel for Plaintiff/Appellant**
         **Zurich American Ins. Co.**
         **Westlake Petrochemical Co.**

**Jennifer E. Michel**
**Preis, Kraft, & Roy**
**P.O. Drawer 94-C**
**Lafayette, LA 70509**
**(337) 237-6062**
**Counsel for Defendant/Appellee**
         **Evanston Insurance Company**

**James Anthony Blanco**
**Stockwell, Sievert, Viccellio, Clements & Shaddock, LLP**
**P. O. Box 2900**
**Lake Charles, LA 70602-2900**
**(337) 536-9491**
**Counsel for Defendant/Appellee**
         **United National Insurance Co.**
         **TMG Industrial Services, Inc.**
         **The Meyer Group**

**Wade Thomas Visconte**
**The Gray Law Firm**
**P. O. Box 1467**
**Lake Charles, LA 70602**
**(337) 494-0694**
**Counsel for Defendant/Appellee**
         **The Meyer Group**

GREMILLION, Judge.

The plaintiffs, Westlake Petrochemical Corporation and its insurers, Zurich American Insurance Company and AIC (Westlake), appeal the judgment of the trial court granting summary judgment in favor of the defendants, TMG Industrial Services, Inc., The Meyer Group, LLC, and their insurers, United National Insurance Company and Evanston Insurance Company, and dismissing the claims against them with prejudice. For the following reasons, we find that the grant of summary judgment was improper and remand the matter for further proceedings.

**FACTS**

On March 14, 2000, The Meyer Group entered into a contract with Westlake to construct a steam letdown and desuperheat station in its Petro II unit. While The Meyer Group was in the process of constructing the station on April 5, 2000, Westlake experienced a power outage which led to the involuntary shutdown of its ethylene furnaces.

On March 20, 2001, Westlake filed a petition for damages alleging that the shutdown resulted from the actions of Michael Deshotel, an employee of The Meyer Group. Named as defendants were TMG Industrial Services, Inc., The Meyer Group, United National, and Evanston. In its petition, Westlake alleged:

> TMG's agents and employees caused the April 4, 2000 power outage when they were working in WPT's facility and were in the process of pulling pipe through a pipe rack. At the time of the outage, Mike Deshotel, a TMG employee who was working alone in the area, was standing on a steel beam directly above the stanchion which contained [an uninterrupted power switch]. While on the steel beam approximately twenty feet above the UPS switch, Mr. Deshotel deliberately dropped a rope, chain and come-along, which struck and turned off the UPS switch. This, in turn, immediately shut off all power to WPT's ethylene furnaces causing the furnaces to immediately and

1

involuntarily shut down. As a result, WPT sustained property damages to its facility as well as business interruption losses, including loss of production and loss of business revenue and profits.

Westlake further alleged that Zurich, who provided insurance coverage for some of the damage it suffered, was subrogated to its rights in the amount of damages paid pursuant to its claim. Westlake alleged three causes of action against the defendants: breach of contract, negligence, and direct action against insurers. TMG, The Meyer Group, United National, and Evanston all answered this petition. In a First Supplemental Petition for Damages, Westlake amended its petition to add:

5A

At all times referenced herein, TMG Industrial Services, Inc. and The Meyer Group, L.L.C. were organized, controlled and operated in a manner so as to constitute a single business enterprise and/or alter egos of one another.

After more procedural maneuvering, TMG, The Meyer Group, United National, and Evanston filed the motions for summary judgment which are the subject of this appeal. The motions allege that the March 14, 2000 contract was the obligation of The Meyer Group, a separate juridical entity, and does not affect TMG. It further alleges that the contract does not clearly and unambiguously require The Meyer Group to provide contractual indemnification under the facts at issue, and that all of the defendants are entitled to summary judgment on the issue of damages suffered by Westlake. Following a hearing on the motion, the trial court issued judgment in favor of all of the defendants, dismissing with prejudice all of Westlake's claims against them. It further designated the judgment as a final judgment. This appeal by Westlake followed.

2

**ISSUES**

Westlake raises four assignments of error on appeal. It argues that:

1. The trial court erred in resolving a disputed material fact by determining that a contract attachment was not part of the contract.

2. The trial court erred in interpreting paragraph eleven of the contract attachment by reading out the plain written words of the contract.

3. The trial court erred in resolving disputed material facts by weighing the evidence, making credibility determinations, and taking judicial notice of matters outside the summary judgment record.

4. The trial court violated La.Civ.Code P. art. 966(D) by granting summary judgment within ten days of the scheduled trial.

**SUMMARY JUDGMENT**

The standard of review in summary judgment cases is well settled, as is the fact that summary judgment is now favored pursuant to La.Code Civ.P. art. 966. Pursuant to Article 966(C)(2), if the mover will not bear the burden of proof at trial, then he is only required to "point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense." Upon this showing, the burden then shifts to the adverse party to produce evidence establishing "that he will be able to satisfy his evidentiary burden of proof at trial." *Id.* The threshold question in reviewing a trial court's grant of summary judgment is whether a genuine issue of material fact remains. *Kumpe v. State*, 97-386 (La.App. 3 Cir. 108/97), 701 So.2d 498, *writ denied*, 98-0050 (La. 3/13/98), 712 So.2d 882.

3

## CONTRACT ATTACHMENT

In its first assignment of error, Westlake argues that the trial court erred in resolving a disputed material fact by finding that an attachment was not part of the March 14, 2000 contract.

In support of their motion with regard to this issue, TMG, The Meyer Group, United National, and Evanston introduced copies of both the contract and the attachment. The contract provides:

> This agreement, effective as of March 12, 2000, is made and entered into by and between Westlake Petrochemicals Corporation, whose address is 900 Hwy 108, Sulphur, LA 70663, herein called "Company", and The Meyer Company LLC, whose address is 917 Sampson Street, Westlake, LA 70669, herein called "Contractor".

> WITNESSETH

> In consideration of the mutual covenants herein contained, Company and Contractor agree, promise, and obligate themselves as follows:

> . . . .

> 8.0    Attachments

> All work shall be performed in strict accordance with the following attachments, attached hereto as a part of this Contract.

> A.    Contract Terms and Conditions

> This agreement supersedes any prior agreement oral or written between subscriber and Westlake Petrochemicals Corporation.

> This agreement shall be controlling regardless of any other purchase orders that are in conflict with this agreement.

> Attached to the contract is a document entitled "**ATTACHMENT 'A,'**

WESTLAKE GROUP of COMPANIES, CONTRACT TERMS AND CONDITIONS,

4

AGREEMENT # <u>WGC-0205</u>." The attachment consists of four pages of terms and conditions, and it is signed by David J. Fontana, Secretary/Treasurer of TMG Industrial Services, on June 2, 1998, and by Richard Gaudet, Senior Buyer for Westlake, on May 28, 1998.

Based on this evidence, we find that The Meyer Group has established a prima facie showing that the two-year old attachment, signed by an officer of TMG, was not a part of its contract with Westlake. Accordingly, the burden shifts to Westlake to establish that it will be able to prove that the attachment was properly attached to this contract.

In opposition to the motion for summary judgment, Westlake introduced the affidavit of Rhonda Harrington, who works in the purchasing department procuring contracts and purchase orders for the various Westlake Group Companies. Harrington stated that contractors were required to sign the "Attachment 'A' Contract Terms and Conditions" document before they could perform work at any Westlake Group facility. Once this document was signed, she stated that it would be attached to any subsequent contracts or purchase orders awarded to that contractor. She stated that this was the standard practice of the Westlake Group companies, and that this practice was carried out in the March 14, 2000 contract between Westlake and The Meyer Group. She further stated that she understood that TMG was a division of The Meyer Group.

Westlake further introduced the deposition testimony of Tim Meyer, the general manager of The Meyer Group. He is also the owner and president of TMG, which has existed since 1995. Although Meyer did not think the attachment was a

5

part of the contract, he admitted that the terms and conditions contained in the attachment were probably those referenced in the contract. He further assumed that he would have to sign off on just such an attachment before his company could perform work for Westlake, but did not know if another such document referencing The Meyer Group existed or if the purchasing department was referencing the one signed by TMG to the contract. Meyer testified that he was not familiar with Westlake's procedures and that he assumed someone in its purchasing department attached the document to the contract. However, he stated that he was not sure if the attachment signed by The Meyer Group's sister company went with the contract. He then retracted his statement by stating that The Meyer Group and TMG were separate entities, although common people worked for both companies.

Westlake also introduced into evidence the April 5, 2000 time sheets pertaining to The Meyer Group's employees working on the steam letdown job. The time sheets are on TMG letterhead. It also introduced invoices from Rental Service Corporation for equipment which was leased by TMG. The five invoices reference job number 6237-003, which Meyer testified was the actual bid job. He stated that the equipment listed in the invoices was used on the steam letdown job. Meyer further testified that Deshotel was an employee of The Meyer Group, even though his March 8, 2000 Employee Withholding Exemption Certificate lists TMG as his employer.

Meyer was also questioned about a May 10, 1999 purchase order issued by Westlake to TMG, which he signed as a salesperson. The purchase order states, "ALL WORK TO BE PERFORMED IN ACCORDANCE WITH T & C'S

6

AGREEMENT # WGC-0205 ESTABLISHED BETWEEN WESTLAKE GROUP AND TMG INDUSTRIAL." When asked if this document refreshed his memory as to whether he would have had to sign off on such an agreement before being allowed to do work, Meyer stated that it did not.

Meyer testified that TMG is still in existence and that it owns equipment, which it leases to The Meyer Group and other companies. Meyer testified that his father owns The Meyer Group and Meyer and Associates, and that both The Meyer Group and TMG are covered under the same insurance policy.

Westlake also introduced the depositions of employees of The Meyer Group, who were working on the steam letdown job on April 5, 2000. Michael Daigle, a pipe fitter, testified that he saw no distinction between The Meyer Group and TMG. Charles Harrington, a pipe fitter for The Meyer Group for five years, testified that The Meyer Group and TMG are the same company. He stated that The Meyer Group is a newer name for TMG. Anthony Koonce, a pipe fitter and welder, testified that TMG was the sister company of The Meyer Group. He stated that The Meyer Group was involved in engineering, while TMG was involved with construction. Koonce further stated that he received his check from The Meyer Group.

Claude Aucoin, the field superintendent on the day at issue, stated that TMG stands for The Meyer Group, that it was the original name, and that it was transferred over to The Meyer Group. He stated that TMG no longer exists, that the company is now strictly The Meyer Group. He further testified that he was unsure if the March 14, 2000 contract was with The Meyer Group or TMG, but denied that

7

the two companies were running simultaneously and that employees were bouncing back and forth between them. He agreed that TMG and The Meyer Group were one and the same company. James Olier, a pipe fitter, testified that he did not draw any distinction between The Meyer Group and TMG. Deshotel testified that he worked for The Meyer Group on several different occasions, but stated that he did not know if he was working for TMG or The Meyer Group.

Finally, Westlake introduced information provided to it by TMG on November 7, 1996, pursuant to its request to become an approved vendor for Westlake. The letter sent by TMG is upon letterhead which states, "**TMG** Industrial Services." Located underneath this is, "A Division of The Meyer Group." The Vendor Questionnaire which is attached to this letter is signed by Meyer, as president of the company. Also attached is a Certificate of Insurance from the McElveen Insurance Agency, Inc., which lists the insured as being "THE MEYER GROUP INC -DBA- TMG INDUSTRIAL SERVICES INC."

In granting summary judgment in favor of TMG, the trial court stated in its oral reasons:

> The only argument against having it attached and accepted as part of the contract is the date of the attachment, number one, and the testimony of the parties that have been deposed. The lady from Westlake does not verify, does not recall whether or not she sent the attachment when she sent the contract to Mr. Meyers to sign. And Mr. Meyer's testimony that he doesn't recall that attachment being a part of the contract, but however, he feels like he would have, if he had to get the job, attach it is basically what he's saying and it would've been part of the contract. But he doesn't recall that being the case. That's a close call. I have a problem with an attachment two years old being attached to a current contract and being made part of a contract. It's sort of like saying that we're

8

going to be bound by contract two years past an activity going on today. That can probably be done, but there ought to be some ratification of that attachment either a letter or an endorsement or something signed saying that notwithstanding the date of this attachment, it is part of this current contract and we expect to be bound by this. I don't find that there's sufficient evidence in the record to support this attachment as being part of the contract.

Counsel for Westlake:

Judge, --

The Court:

Notwithstanding argument counsel has made about the testimony of Mr. Meyers.

Counsel for Westlake:

And just so you understand, in the record there is evidence in our summary judgment opposition of other contracts --

The Court:

Doing the same thing.

Counsel for Westlake:

-- doing the exact same thing and there's the affidavit of our person saying this is our standard course of practice to attach by reference.

The Court:

This is true and let the record so reflect that fact and I did take that into consideration, but I'm only being asked to comment and make a ruling with regard to this attachment and whether it's the custom of the business of Westlake is acceptable, is understandable. But, I'm not bound by that custom because I don't find independent from that custom that if parties intend to be bound by an attachment two years old, there ought to be something so there can be no unambiguous acceptance of it. There ought to be signing by some current officer of the corporation, resigning it, recopying it or signing the attachment itself, the original,

9

by some current member or some letter saying we understand that this thing is two years old, but we still want to be bound by it, something to corroborate the intention of the parties. Otherwise, I'm only looking at one side. I'm looking at Westlake's custom and what Westlake says, but on the other side this person has not, to my satisfaction, accepted this attachment because he signed the contract, but he did not sign the attachment. For that reason, I don't find that this attachment applies to this contract.

After reviewing the record and the trial court's oral reasons, it is evident that it reached its decision only after delving into the merits of the matter and making factual determinations which are properly left to the trier of fact. "It is not the court's function on a motion for summary judgment to determine or even inquire into the merits of the issues presented." *Lexington House v. Gleason*, 98-1818, p. 6 (La.App. 3 Cir. 3/31/99), 733 So.2d 123, 126, *writ denied*, 99-1290 (La. 6/25/99), 746 So.2d 603. The trial court, while comparing the testimony of Meyer and Rhonda Harrington on the issue of whether the attachment was a part of this contract, admitted that this was a "close call." It further stated that it had a problem with a two-year-old attachment being made a part of this contract, without any further endorsement by The Meyer Group. The trial court is clearly weighing the evidence. Furthermore, the trial court relied on testimony which was not part of the record. It stated with regard to Harrington's affidavit, "The lady from Westlake does not verify, does not recall whether or not she sent the attachment when she sent the contract to Mr. Meyers to sign." Harrington's affidavit simply states that the standard practice of Westlake was to have contractors performing work at its facility sign such a document as a prerequisite to performing work for it, which document would then be attached to any subsequent contract or purchase order performed by the contractor. She then states

10

that this practice was implemented in the March 14, 2000 contract. Harrington never stated that she could not recall sending the attachment to Meyer as part of the contract. We further find that a genuine issue of material fact remains with regard to the question of whether TMG and The Meyer Group were, in fact, the same company. Accordingly, the grant of summary judgment on these issues was inappropriate and the matter is remanded for further proceedings.

## CONTRACTUAL INDEMNIFICATION

In its second assignment of error, Westlake argues that the trial court erred in interpreting Paragraph Eleven of the attachment by reading out the plain written words of the contract. We agree.

Paragraph Eleven of "Attachment 'A'" provides:

Contractor agrees to be liable for and shall indemnify, hold harmless, and defend Company, its directors, officers, employees, agents and representatives (hereinafter referred to collectively as "Company") from and against any and all claims, losses, damages, causes of action, suites (sic) and liability of every kind, including all expenses of litigation, court costs, and attorney fees, for injury to or death of any person or damage to or destruction of any property, including the Work to be done hereunder and other property of Company, arising out of or in connection with the Work done under the contract by Contractor, its Subcontractors, employees, agents, representative, or third parties. Such Indemnity shall apply where the claims, losses, damages, causes of action, suits or liability arise in part from the negligence of Company. Contractor shall be responsible for all damage and loss sustained by Contractor to Contractor's tools and equipment utilized in the performance of all work under this Agreement.

It is the expressed intention of the parties hereto, both Contractor and Company, that the indemnity provided for in the section is by contractor to indemnify and protect Company from the consequences of Company's own negligence, whether active or passive, or whether such negligence is a concurring cause of the injury, death, or damage. However, the indemnify provided in the section shall have no application to any claim, loss, damages cause of action, suit, or liability where the injury, death or damage results from the sole negligence of

11

Company.

In interpreting these clauses, the trial court stated:

I find that the language in the attachment, even if you accepted the attachment, when it says for and against, that conjunction seems to suggest to me that the parties intended to be bound by indemnification agreement in any loss to Westlake Group as a result of payment Westlake Group had to make to some third party. I just don't think that they would've signed a contract for Westlake's claim that it did not have to pay to a third party. Because it says for and against. Against, it's got to be against Westlake. There's got to be somebody making a claim against Westlake. I read that as a conjunction and both have to exist for the contract indemnification to apply. Even if the attachment was accepted as part of the contract, then I find that the language suggests that it has to be a third party involved here for indemnification to apply. I don't find indemnification applies in this case for those reasons.

Although we agree with the trial court's finding that "and" is a conjunction, we disagree with its finding that indemnification only exists if somebody is making a claim against Westlake. With regard to "and," Blacks Law Dictionary, 87 (6th ed. 1990), states:

A conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first. Added to; together with; joined with; as well as; including. Sometimes construed as "or." Land & Lake Ass'n, v. Conklin, 182 A.D. 546, 170 N.Y.S. 427, 428.

It expresses a general relation or connection, a participation or accompaniment in sequence, having no inherent meaning standing alone but deriving force from what comes before and after. In its conjunctive sense the word is used to conjoin words, clauses, or sentences, expressing the relation of addition or connection, and signifying that something is to follow in addition to that which proceeds and its use implies that the connected elements must be grammatically co-ordinate, as where the elements preceding and succeeding the use of the words refer to the same subject matter. While it is said that there is no exact synonym of the word in English, it has been defined to mean "along with", "also", "and also", "as well as", "besides", "together with". Oliver v. Oliver, 286 Ky. 6, 149 S.W.2d 540, 542.

12

If the first sentence is broken down into two sentences, as it pertains to this issue, we have (a) Contractor agrees . . . to . . . indemnify . . . Company . . . **from** . . . any and all claims, losses, damages, causes of action, suits and liability of every kind; and (b) Contractor agrees . . . to . . . indemnify . . . Company . . . **against** . . . any and all claims, losses, damages, causes of action, suits and liability of every kind. (Emphasis added). The placement of "and" between "from" and "against," implies that these words should have different meanings, otherwise, the use of "from" would be redundant. Reading the sentences separately, we find that it is clear that The Meyer Group agreed to indemnify Westlake from any and all damages, including all expenses of litigation, court costs, and attorney fees, for damages to or destruction of any property, including the work that was being done pursuant to the contract. Pursuant to Paragraph Eleven, The Meyer Group would only be excused from indemnifying Westlake if the damage arose as a result of the sole negligence of Westlake. "When a contract can be interpreted from the four corners of the instrument, the question of contractual interpretation is answered as a matter of law, and summary judgment is appropriate." *Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note*, 01-2219, p. 13 (La.App. 1 Cir. 11/20/02), 837 So.2d 11, 24, *writ denied*, 03-0418 (La. 4/21/03), 841 So.2d 805. The trial court's interpretation of the sentence effectively reads out the word "from" from the contract. Since the contract is the law between the parties and, considering the plain language of the contract, we find that the grant of summary judgment on this issue was improper.

13

**NEGLIGENCE**

In its third assignment of error, Westlake argues that the trial court erred in granting summary judgment on the issue of its negligence claim against The Meyer Group, dismissing its claim with prejudice.

In support of their motion for summary judgment on the issue of negligence, TMG, The Meyer Group, United National, and Evanston introduced the depositions of The Meyer Group's employees Deshotel, Aucoin, and William Gartman, as well as an excerpt from the deposition of Westlake employee, David Chaumont. It also introduced the letter terminating its contract with Westlake and the entrance logs for Westlake's plant.

Deshotel testified that he was working up in the pipe rack moving pipe on the date of the incident. He stated that pipe was lifted up into the rack by a crane and then pulled along the rack by chain falls until it reached the location where it was to be welded into place. He stated that they started from the south end of the pipe rack and then worked their way north down the rack. Since there were not enough chain falls for every column, he stated that, once they were past a column, they would lower the chain fall to the ground and then move it down the alley to another column, where it would be pulled back up into the rack. Deshotel testified that a chain fall weighs approximately forty-five to fifty pounds.

Deshotel testified that Koonce threw him a rope and that he attached it to a chain fall and then lowered it until it was seven to eight feet off the ground. When he could not find Koonce, he stated that he lowered the chain fall all the way to the ground and dropped the rope to the ground. He estimated that the rope was

14

fifty feet long.  He testified that they were evacuated from the site approximately thirty to forty minutes later.  He further stated that Olier told him that he moved the chain fall out of the middle of the alley and placed it next to the column where the switch was located.

Deshotel testified that he did not hit the switch in question with the chain fall.  He stated that he lowered it slowly and that he was looking down for someone on the ground while he lowered it.  He stated that he stopped lowering it when it was about seven to eight feet from the ground, to make sure that he did not hit anybody with it.  Deshotel testified that there were people working around, other than The Meyer Group employees.  He stated that he also saw an operator every now and then, and that he sometimes saw other people under the rack where they were working.  However, he did not recall seeing anybody around when he was lowering the chain fall.  He testified that he did see someone off to the side, on the other side of the column.  If someone had been around, he stated that he would have asked them to catch the chain fall.  Deshotel testified that he did not see anyone enter the area and turn the switch off.

Aucoin testified that he was at the site on the morning in question, and that the shut down occurred prior to noon.  He stated that they were still pulling pipe into the rack and that they had worked their way to the middle of the rack.  He testified that they would normally barricade the area with yellow caution tape, unless there was a real crucial lift going on, at which time they would barricade the area with red tape.  Red tape indicated that persons were to stay clear of the area.  He remembered that the area where the welding was taking place was barricaded with

15

yellow caution tape.

Aucoin stated that he heard the whistles and sirens going off and then the evacuation occurring. Sometime afterwards, he stated that he went out to the site with Olier and Westlake employees Pete Brown and David Chaumont, because they felt that a switch might have been tripped by one of The Meyer Group employees. He stated that they found a chain fall on the ground underneath the column on which the switch was located. Aucoin testified that Deshotel told him that he lowered the chain fall down from the pipe rack approximately seven feet east of the column, and that somebody moved it over to the column so that it was out of the way. He stated that Daigle said he saw Deshotel lower the chain fall away from the column. Aucoin admitted that he did not witness this.

The Meyer Group also introduced an excerpt from the deposition of its employee, William Gartmen. He testified that the yellow barricade tape indicates that a person entering an area should use caution, whereas red barricade tape indicates that the area is closed and no one should enter it. He further testified that a part of their daily routine was to deal with housekeeping matters. This included picking up chain falls and moving them out of the walk area to prevent tripping. He stated that, nine times out of ten, once a chain fall was lowered, someone would pick it up and place it against a column or something out of the way. Gartmen further testified that all of the employees on this job were experienced hands.

In the excerpt from his deposition, Chaumont affirmed that Westlake's conclusion that Deshotel tripped the switch while lowering the chain fall was solely based on the fact that The Meyer Group's equipment was found at the base of the

column containing the switch and that they were working in that area. In its termination letter to The Meyer Group, Westlake stated the following:

> An inspection following the incident found that the breaker switch that shuts down the entire facility was set to the "OFF" position. Upon further investigation, it was revealed that employees from The Meyer Group were the only persons located in the immediate area of the switch just prior to and at the time of the shut down. Because it has become increasingly evident that employees from your company were responsible for the shut down of the Petro II plant, please be advised that the above-referenced contract between Westlake Petrochemicals Corp. and The Meyer Group, LLC (the "Contract") is hereby terminated effective immediately.

Finally, The Meyer Group introduced the entrance logs for Westlake's plant. The April 5, 2000 logs reveal that The Meyer Group entered the plant at gate six, with their destination being the "site." Prior to the incident, employees for The Meyer Group entered the gate at 6:44, 6:45, and 7:09 a.m. Of the sixteen persons entering the plant, whose destination was the "site," only three were listed as working for The Meyer Group. Seven persons entered gate six heading for the Petro II Unit. The logs from the main gate show that only eleven persons checked in prior to noon, with their destination being the Petro II Unit. Three of these checked in at least twenty minutes to noon.

After reviewing this evidence, we find that the evidence presented by The Meyer Group fails to establish a prima facie showing that its employee was not negligent in hitting the switch in question while lowering the chain fall. The evidence presented raises a question of fact as to the possible cause of the incident, especially when viewed in light of the deposition testimony presented by Westlake.

Jayce Hoffpauir, a Westlake employee, testified that he found the switch in the "off" position approximately thirty to forty-five minutes after the incident

17

occurred. He testified that The Meyer Group's scaffolding was located directly above and slightly to the south of the switch. He further stated that a chain fall was on the ground, which was attached to a rope connected to the rack. He stated that the rope was hanging down along the face of the switch, approximately one foot off of it. Also located nearby was a tool bucket and a safety harness.

Koonce testified that he saw the chain fall in the middle of the alley, seven to eight feet from the switch, fifteen to twenty minutes prior to the surging of the flare, which warned of the shutdown. He stated that someone picked it up and placed it against the column. He further stated that J.E. Merit Contractors were working a bit east of The Meyer Group's job location.

Daigle recalled Deshotel lowering several chain falls to the ground, but stated that he focused on Deshotel while he was doing so, and that he did not watch the chain falls all the way down. He testified that he did not move the chain fall once it was on the ground, nor did he see anyone else do so. He further stated that he did not see how it was possible for Deshotel to hit the switch, since he was six feet away from the switch when he lowered the chain fall. Finally, he could not recall seeing any other persons or jobs going on in the same vicinity of their job.

Charles Harrington testified that he did not see anyone else working below the pipe rack while they were working there.

After considering the evidence introduced into the record, we find that genuine issues of material fact remain with regard to the issue of the possible negligence of The Meyer Group in causing the April 5, 2000 shutdown. Genuine issues of material fact remain on the issue of whether Deshotel lowered the chain fall in such a way that it hit the switch or whether the chain fall was moved after he

18

lowered it.  Moreover, genuine issues remain as to whether any other persons were present in the area at the time the switch was shut off.  Although the logs reveal that numerous persons were in the Petro II Unit, The Meyer Group's own employees testified that no one else was in the area where they were working.  Accordingly, we find that the grant of summary judgment on this issue was inappropriate.  Therefore, we remand the matter to the trial court for further proceedings.

Because we are remanding the matter for trial, Westlake's final assignment of error is rendered moot.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed and the matter is remanded for further proceedings.  The costs of this appeal are assessed to the defendants-appellees, TMG Industrial Services, Inc., The Meyer Group, LLC, and their insurers, United National Insurance Company and Evanston Insurance Company.

**JUDGMENT VACATED; REMANDED.**